Barry I. Levy, Esq. (BL 2190)
Max Gershenoff, Esq. (MG 4648)
Steven T. Henesy, Esq. (SH 6357)
RIVKIN RADLER LLP
926 RXR Plaza,
Uniondale, NY 11553
(516) 357-3000
barry.levy@rivkin.com
max.gershenoff@rivkin.com
steven.henesy@rivkin.com
*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General Insurance
Company, and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| GOVERNMENT EMPLOYEES INSURANCE CO., GEICO INDEMNITY CO., GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY CO., | Docket No.: _____(  ) |
| Plaintiffs, | **Plaintiffs Demand a Trial by Jury** |
| –against– | |
| MICHAEL GERLING, M.D., NY ORTHOPEDICS, P.C., GERLING INSTITUTE NJ, P.C., SPINE HEALTH ORTHOPEDIC, P.C., SPINE CONSULT NJ, P.C., JOSEPH PYUN, M.D., IGOR DOVMAN, VLADIMIR GRANOVSKIY a/k/a WALTER GRAN, and CAMPIRO, INC., | |
| Defendants. | |

## <u>COMPLAINT</u>

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General

Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for

their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $2,200,000.00 that the Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent and unlawful no-fault insurance charges through Gerling Institute NJ, P.C. ("Gerling Institute"), NY Orthopedics, P.C. ("NY Orthopedics"), Spine Consult NJ, P.C. ("Spine Consult"), and Spine Health Orthopedic, P.C. ("Spine Health") for purported examinations and surgical procedures (collectively the "Fraudulent Services").

2.      The Fraudulent Services were provided, to the extent that they were provided at all, to individuals ("Insureds") who claimed to have been involved in automobile accidents and were eligible for insurance coverage under GEICO no-fault insurance policies.

3.      In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $75,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of NY Orthopedics, Gerling Institute, Spine Health, and Spine Consult because of the fraudulent and unlawful conduct described herein.

4.      The Defendants fall into the following categories:

(i)      Defendant Michael Gerling, M.D. ("Gerling") is a physician licensed to practice medicine in New York and New Jersey who owned and controlled NY Orthopedics, Gerling Institute, Spine Consult, and Spine Health, and used NY Orthopedics, Gerling Institute, Spine Consult, and Spine Health to submit fraudulent and unlawful no-fault insurance billing for the Fraudulent Services to insurance companies, including GEICO.

(ii)     Defendants NY Orthopedics and Spine Health are New York medical professional corporations. Defendants Gerling Institute and Spine Consult are New Jersey medical professional corporations. The Defendants purported to provide and bill for the Fraudulent Services through NY Orthopedics, Spine Health, Spine Consult, and Gerling Institute.

(iii)    Defendant Joseph Pyun, M.D. ("Pyun") is a physician licensed to practice medicine in New York and New Jersey who purported to perform many of the Fraudulent Services on behalf of NY Orthopedics, Spine Health, Spine Consult, and Gerling Institute.

(iv)    Defendants Igor Dovman ("Dovman") and Vladimir Granovskiy a/k/a Walter Gran ("Gran") are unlicensed individuals who used a series of shell companies – including Defendant Campiro, Inc. ("Campiro") to execute an unlawful patient brokering scheme which included, among other things, the referral of patients to Gerling and NY Orthopedics for unnecessary surgical procedures.

(v)    Defendant Campiro is a New York corporation that was used by Dovman and Gran to execute an unlawful patient brokering scheme which included, among other things, the referral of patients to Gerling and NY Orthopedics for unnecessary surgical procedures.

5.    As discussed below, the Defendants at all relevant times have known that:

(i)    the Defendants were engaged in an unlawful patient brokering scheme and paid and received unlawful compensation in exchange for patient referrals;

(ii)    the Defendants engaged in an unlawful self-referral scheme;

(iii)    the Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iv)    in many cases, the Fraudulent Services never were legitimately provided in the first instance;

(v)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and

(vi)    the Fraudulent Services were not provided in compliance with relevant laws and regulations governing health care practice and/or licensing laws, as a result, were not eligible for no-fault reimbursement in the first instance.

6.    As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that they billed or caused to be billed to GEICO. The charts annexed hereto as Exhibits "1" – "4" set forth a large representative sample of the fraudulent claims that have been identified to-date that the Defendants submitted, or caused to be submitted, to GEICO via the mails.

7.      The Defendants' fraudulent and unlawful scheme began no later than 2017 and has continued uninterrupted since that time. As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $2,200,000.00.

## THE PARTIES

### I.      Plaintiffs

8.      Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York and New Jersey.

### II.      Defendants

9.      Defendant Gerling resides in and is a citizen of New York. Gerling was licensed to practice medicine in New York on or about August 23, 2006, and was licensed to practice medicine in New Jersey on or about June 22, 2011. Gerling owned and controlled NY Orthopedics, Gerling Institute, Spine Consult, and Spine Health, purported to perform many of the Fraudulent Services, and used Gerling Institute, Spine Consult, and Spine Health as vehicles to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers.

10.      Defendant NY Orthopedics is a New York medical professional corporation with its principal place of business in New York. NY Orthopedics was incorporated in New York on or about November 1, 2013, was owned and controlled by Gerling, and was used by Gerling as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers.

11.      Defendant Gerling Institute is a New Jersey medical professional corporation with its principal place of business in New Jersey. Gerling Institute was incorporated on or about August

16, 2019, was owned and controlled by Gerling, and was used by Gerling as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers.

12.     Defendant Spine Health is a New York medical professional corporation with its principal place of business in New York. Spine Health was incorporated in New York on or about August 9, 2018, was owned and controlled by Gerling, and was used by Gerling as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers.

13.     Defendant Spine Consult is a New Jersey medical professional corporation with its principal place of business in New Jersey. Spine Consult was incorporated in New Jersey on or about January 1, 2015, was owned and controlled by Gerling, and was used by Gerling as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers.

14.     Defendant Pyun resides in and is a citizen of New York. Pyun was licensed to practice medicine in New York on or about January 25, 2016 and was licensed practice medicine in New Jersey on or about April 22, 2016. Pyun was employed by or otherwise associated with NY Orthopedics, Spine Health, Spine Consult, and Gerling Institute, and purported to perform many of the Fraudulent Services.

15.     Defendant Dovman resides in and is a citizen of New York. Together with Gran, Dovman controlled Campiro, and used Campiro to pay unlawful compensation to Gerling, NY Orthopedics, and their patients to incentivize Gerling and NY Orthopedics to provide – and patients to undergo – unnecessary, invasive, and expensive surgical procedures.

16.     Defendant Gran resides in and is a citizen of New York. Together with Dovman, Gran controlled Campiro, and used Campiro to pay unlawful compensation to Gerling, NY Orthopedics, and their patients to incentivize Gerling and NY Orthopedics to provide – and patients to undergo – unnecessary, invasive, and expensive surgical procedures.

17.     Defendant Campiro is a New York corporation with its principal place of business in New York. Campiro was used by Dovman and Gran to pay unlawful compensation to Gerling and NY Orthopedics and their patients to incentive Gerling and NY Orthopedics to provide – and patients to undergo – unnecessary, invasive, and expensive surgical procedures.

18.     Dovman has a history of engaging in no-fault insurance fraud and patient brokering schemes. For instance, Dovman was a named defendant in an action entitled <u>Government Employees Ins. Co. v. Mayzenberg, et al.</u>, E.D.N.Y. Case No. 1:17-cv-02802 (the "Mayzenberg Action"), in which – as in the present case – he was alleged to have engaged in a no-fault insurance fraud and racketeering scheme involving unlawful patient brokering and kickbacks.

19.     During his first deposition in the Mayzenberg Action, Dovman invoked the Fifth Amendment privilege against self-incrimination in response to virtually every question posed to him, including in response to questions as to whether he had received kickbacks from health care providers in exchange for patient referrals, and whether he had incorporated a series of shell companies to conceal that scheme.

20.     In August 2022, District Judge I. Leo Glasser granted GEICO's motion for summary judgment in the Mayzenberg Action on GEICO's RICO conspiracy and aiding and abetting fraud claims, and found that GEICO had demonstrated that Dovman had engaged in a wide-ranging, unlawful patient brokering scheme involving shell companies.

21.     In particular, Judge Glasser found, among other things, that:

Defendants plainly have not sustained their allegation that the Dovman Companies provided legitimate marketing and advertising services. On the contrary, a rational factfinder could draw only one conclusion: the Mayzenberg Defendants paid the Dovman Companies for patient referrals.
                            ***
Igor Dovman invoked his Fifth Amendment privilege against self-incrimination in response to being asked if he referred patients to the Mayzenberg Defendants in exchange for payments from Sanli and Laogong. [Attorney Daniel Corley, Esq.] also invoked the

Fifth Amendment, when asked if he handled funds for unlawful patient referrals or participated in a scheme involving patient referrals. They easily could have said that the payments were for legitimate services, but they did not.

*** 

As the Court has already explained, it is beyond genuine dispute that the Dovman Companies provided no legitimate marketing or advertising services to Mingmen and were, instead, providing paid patient referrals. Necessarily, therefore, as controllers of the Dovman Companies, [Igor Dovman and his wife, Tamilla Dovman] knew they were accepting payment for these referrals. The circuitous and divergent routes by which the Dovmans collected payment from Mayzenberg leave no doubt that they knew of the fraud and took steps to hide its operation.

Gov't Emps. Ins. Co. v. Mayzenberg, No. 17-cv-2802, 2022 WL 5173745 (E.D.N.Y. Aug. 24, 2022).

22.     Based on these findings, the Court in the GEICO v. Mayzenberg action awarded GEICO more than $2,500,000.00 in damages, for which Dovman was jointly and severally liable.

## IV.     Other Relevant Individuals and Entities

23.     Although they have not been named as defendants, Garden State Pain Control Center, PA ("Garden State Pain") Neil Sinha, M.D., and Dev Sinha, M.D. (the "Sinhas") are relevant to understanding GEICO's allegations and claims in this action.

24.     The Sinhas are physicians licensed to practice medicine in New Jersey. The Sinhas owned and controlled Garden State Pain, a New Jersey medical professional association.

25.     The Sinhas and Garden State Pain referred Insureds to Gerling, NY Orthopedics, Gerling Institute, and Spine Health in exchange for unlawful compensation from Gerling, NY Orthopedics, Gerling Institute, and Spine Health.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

27. This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

28. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

29. Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

30. For example, the Defendants submitted or caused to be submitted a massive amount of fraudulent billing to GEICO in New York, under New York automobile insurance policies, for treatment that they purported to provide to GEICO's New York-based Insureds, typically in the Eastern District of New York. In reliance on the fraudulent and unlawful claims, personnel at a GEICO office in the Eastern District of New York issued payment on the claims.

31. What is more, and as set forth herein, the Defendants transacted and solicited substantial business in New York, derived a substantial amount of revenue based on their fraudulent and unlawful business activities in New York, and committed tortious acts that caused injury to GEICO in New York.

## ALLEGATIONS COMMON TO ALL CLAIMS

## I.   An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement

32. GEICO underwrites automobile insurance in New York and New Jersey.

**A.      Pertinent New York Law Governing No-Fault Insurance Reimbursement**

33.      New York's no-fault insurance laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.

34.      Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.), automobile insurers are required to provide no-fault insurance benefits ("Personal Injury Protection" or "PIP Benefits") to Insureds.

35.      In New York, PIP Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

36.      In New York, an Insured can assign their right to PIP Benefits to health care goods and services providers in exchange for those services.

37.      In New York, pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3") or by using the Health care Financing Administration insurance claim form (known as the "HCFA-1500 form" or "CMS-1500 form").

38.      Pursuant to the New York no-fault insurance laws, health care services providers are not eligible to bill for or to collect PIP Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services, or if they fail to meet the applicable licensing requirements in any other states in which such services are performed.

39.    For    instance,    the    implementing    regulation    adopted    by    the    New    York

Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1)
> of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local
> licensing requirement necessary to perform such service in New York or meet <u>any</u> applicable
> licensing requirement necessary to perform such service in any other state in which such
> service is performed.

(Emphasis added).

40.    Pursuant to the New York Education Law, foreign medical professional entities

operating in New York must apply for authority to do business in New York and must have a

certificate of authority from the New York Department of Education. <u>See</u>, <u>e.g.</u>, N.Y. Educ. Law

§§ 6509(8), 6530(12); N.Y. Bus. Corp. Law §§ 1503, 1514, 1530.

41.    Foreign medical professional entities that operate in New York without obtaining

the requisite certificate of authority and authorization are not eligible to receive PIP Benefits.

42.    New York law prohibits licensed health care services providers, including licensed

physicians, from paying or accepting compensation in exchange for patient referrals. <u>See</u>, <u>e.g.</u>,

New York Education Law §§ 6509-a; 6530; 6531; <u>see also</u> 8 N.Y.C.R.R. § 29.1. Therefore, a

health care provider that pays or receives kickbacks or unlawful compensation in exchange for

patient referrals is not eligible to receive PIP Benefits.

43.    In addition, New York law prohibits licensed health care services providers,

including physicians, from referring patients to health care practices in which they have an

ownership or investment interest unless: (i) the ownership or investment interest is disclosed to the

patient; and (ii) the disclosure informs the patient of his or her "right to utilize a specifically

identified alternative health care provider if any such alternative is reasonably available". <u>See</u> New

York Public Health Law § 238-d.

10

44.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

45.     When a health care services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

46.     Pursuant to New York Insurance Law § 403, the NF-3 and HCFA-1500 forms submitted by a health care services provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

**B.     Pertinent New Jersey Law Governing No-Fault Insurance Reimbursement**

47.     Like New York, New Jersey has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries.  The statutory system is embodied within the Compulsory Insurance Law (N.J.S.A. 39:6B–1 to 3) and the Automobile Reparation Reform Act (N.J.S.A. 39:6A–1 et seq.), which require automobile insurers to provide PIP Benefits to Insureds.

48.     As in New York, under the New Jersey no-fault laws, an Insured can assign his or her right to PIP Benefits to health care services providers in exchange for those services. Pursuant to such an assignment, a health care services provider may submit claims directly to an insurance

company in order to receive payment for medically necessary services, using the required claim forms, including the HCFA–1500 form.

49.     In order for a health care services provider to be eligible to receive PIP Benefits under the New Jersey no-fault laws, it must comply with all significant laws and regulations governing health care practice in New Jersey.

50.     Thus, a health care services provider is not entitled to receive PIP Benefits where it has failed to comply with all significant statutory and regulatory requirements governing health care practice in New Jersey, whether or not the underlying services were medically necessary or actually provided.

51.     Moreover, in order for a specific health care service to be eligible for PIP reimbursement, the service itself must be provided in compliance with all significant laws and regulations governing health care practice in New Jersey.

52.     By extension, insurers such as GEICO are not obligated to make any payments of PIP Benefits to health care services providers that are not in compliance with all significant statutory and regulatory requirements governing health care practice in New Jersey.

53.     Furthermore, insurers such as GEICO are not obligated to make any payments of PIP Benefits for health care services that are not rendered in compliance with all significant statutory and regulatory requirements governing health care practice in New Jersey.

54.     Pursuant to N.J.S.A 14A:17-5, a foreign professional corporation cannot offer professional services in the State of New Jersey without being properly incorporated under New Jersey law.

55.     Insurers are not required to pay PIP Benefits for health care services that are unlawfully provided in New Jersey through foreign professional corporations.

56.     Pursuant to N.J.A.C. 13:35-6.17, physicians are prohibited from paying or receiving compensation, either directly or indirectly, in exchange for patient referrals.

57.     Among other things, N.J.A.C. 13:35-6.17(c)(1) specifies that:

A licensee shall not, directly or indirectly, give to or receive from any licensed or unlicensed source a gift of more than nominal (negligible) value, or any fee, commission, rebate or bonus or other compensation however denominated, which a reasonable person would recognize as having been given or received in appreciation for or to promote conduct by a licensee including: purchasing a medical product, ordering or promoting the sale or lease of a device or appliance or other prescribed item, prescribing any type of item or product for patient use or making or receiving a referral to or from another for professional services. For example, a licensee who refers a patient to a health care service (such as a cardiac rehabilitation service or a provider of durable medical equipment or a provider of testing services) shall not accept from nor give to the health care service a fee directly or indirectly in connection with the referral, whether denominated as a referral or prescription fee or examination or supervision fee or space leasing in which to render the services (other than as permitted in (h) below), or by any other name ….

(Emphasis added).

58.     N.J.A.C. 13:35-6.17(c)(1)(ii) specifies that "[t]his section shall be construed broadly to effectuate its remedial intent."

59.     In keeping with the broad anti-kickback prohibitions in N.J.A.C. 13:35-6.17(c)(1), N.J.A.C. 13:35-6.17(h) provides, in pertinent part, that:

A Board licensee may lease space or medical equipment to or from another licensed health care professional to whom patients are referred, only where rent is a fixed fee set in advance and determined by the fair market value, or less, and is for a regular term and not for sporadic use of the space or equipment.

(Emphasis added).

60.     Physicians, medical practices, and other health care providers that pay or receive unlawful compensation in exchange for patient referrals are not eligible to collect PIP Benefits.

61.     In New Jersey, with limited exceptions that are not applicable here, "practitioners" generally may not refer patients to a health care practice in which they have a "significant beneficial interest".

13

62.     Specifically, N.J.S.A. 45:9–22.5 (the "Codey Law") provides – in pertinent part – that:

> A practitioner shall not refer a patient or direct an employee of the practitioner to refer a patient to a health care service in which the practitioner, or the practitioner's immediate family, or the practitioner in combination with the practitioner's immediate family has a significant beneficial interest ….

63.     Pursuant to N.J.S.A. 45:9–22.4:

> "Practitioner" means a physician, chiropractor or podiatrist licensed pursuant to Title 45 of the Revised Statutes.

> "Health care service" means a business entity which provides on an inpatient or outpatient basis: testing for or diagnosis or treatment of human disease or dysfunction; or dispensing of drugs or medical devices for the treatment of human disease or dysfunction. Health care service includes, but is not limited to, a bioanalytical laboratory, pharmacy, home health care agency, rehabilitation facility, nursing home, hospital, or a facility which provides radiological or other diagnostic imagery services, physical therapy, ambulatory surgery, or ophthalmic services.

> "Significant beneficial interest" means any financial interest; but does not include ownership of a building wherein the space is leased to a person at the prevailing rate under a straight lease agreement, or any interest held in publicly traded securities.

64.     Pursuant to N.J.S.A. 45:9–22–5(c)(1), the Codey Law's restrictions on patient referrals do not apply to:

> medical treatment or a procedure that is provided at the practitioner's medical office and for which a bill is issued directly in the name of the practitioner or the practitioner's medical office ….

65.     Pursuant to N.J.S.A. 45:9-22-5(c)(3), the Codey Law's restrictions on patient referrals also do not apply to referrals for certain procedures performed at an ambulatory care facility, such as an ambulatory surgery center, so long as certain conditions are met (the "ASC Exception").

66.     In particular, and as set forth in N.J.S.A. 45:9-22-5(c)(3), prior to January 2019 the Codey Law's restrictions did not apply to:

ambulatory surgery or procedures requiring anesthesia performed at a surgical practice registered with the Department of Health . . . or at an ambulatory care facility licensed by the Department of Health to perform surgical and related services or lithotripsy services, if the following conditions are met:

> (a)   the practitioner who provided the referral personally performs the procedure;

> (b)   the practitioner's remuneration as an owner of or investor in the practice or facility is directly proportional to the practitioner's ownership interest and not to the volume of patients the practitioner refers to the practice or facility;

> (c)   all clinically-related decisions at a facility owned in part by non-practitioners are made by practitioners and are in the best interests of the patient; and

> (d)   disclosure of the referring practitioner's significant beneficial interest in the practice or facility is made to the patient in writing, at or prior to the time that the referral is made, consistent with the provisions of section 3 of P.L. 1989, c. 19 (C.45:9-22.6).

67.    After January 2019, the Codey Law's restrictions did not apply to:

ambulatory surgery or procedures involving the use of any anesthesia performed at a surgical practice registered with the Department of Health . . . or at an ambulatory care facility licensed by the Department of Health to perform surgical and related services or lithotripsy services, if the following conditions are met:

> (a)   the practitioner who provided the referral personally performs the procedure;

> (b)   the practitioner's remuneration as an owner of or investor in the practice or facility is directly proportional to the practitioner's ownership interest and not to the volume of patients the practitioner refers to the practice or facility;

> (c)   all clinically-related decisions at a facility owned in part by non-practitioners are made by practitioners and are in the best interests of the patient; and

> (d)   disclosure of the referring practitioner's significant beneficial interest in the practice or facility is made to the patient in writing, at or prior to the time that the referral is made, consistent with the provisions of section 3 of P.L. 1989, c. 19 (C.45:9-22.6).

68.     Physicians, medical practices, and ambulatory care facilities in New Jersey that engage in self-referral arrangements that violate the Codey Law are not eligible to receive PIP Benefits.

69.     Pursuant to N.J.S.A. 39:6A–4, an insurer such as GEICO is only required to pay PIP Benefits for reasonable, necessary, and appropriate treatment. At the same time, a health care services provider is only eligible to receive PIP Benefits for medically necessary services.

70.     Like New York, New Jersey has established a medical fee schedule (the "NJ Fee Schedule") that is applicable to claims for PIP Benefits.

71.     When a health care services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NJ Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

## II.     The Defendants' Fraudulent Scheme

72.     Beginning no later than 2017, and continuing through the present day, the Defendants conceived and implemented a fraudulent scheme in which they caused a massive amount of fraudulent and unlawful PIP billing to be submitted to GEICO for medically unnecessary, illusory, unlawful, and otherwise non-reimbursable services in New York and New Jersey.

## A.     Gerling Institute's Unlawful Operations in New York

73.     As set forth above, Gerling Institute is a New Jersey medical professional corporation, not a New York medical professional corporation.

74.     As set forth above, pursuant to 11 N.Y.C.R.R. § 65-3.16(a)(12), health care services providers are not eligible to collect PIP Benefits if the providers fail "to meet any applicable New York State or local licensing requirement necessary to perform such service in New York …."

75.     Pursuant to the New York Education Law, medical professional corporations operating in New York must have a certificate of authority from the New York Department of Education and must be properly incorporated in New York. See, e.g., N.Y. Educ. Law §§ 6509, 6530; N.Y. Bus. Corp. Law §§ 1503, 1514.

76.     Gerling Institute never obtained a certificate of authority from the New York Education Department and was never properly incorporated in New York.

77.     For instance, searches of the New York Department of State Division of Corporations website indicate that Gerling Institute was never incorporated in New York and has never been authorized to do business in New York.

78.     Likewise, searches of the New York Education Department's Office of the Professions website indicate that Gerling Institute never received any certificate of authority from the Education Department.

79.     Even so, Gerling routinely and unlawfully operated Gerling Institute as a medical practice in New York.

80.     In particular, between August 2021 and October 2022, Gerling and the Gerling Institute submitted more than $800,000.00 in billing to GEICO for services unlawfully provided – to the extent they were provided at all – through Gerling Institute in New York.

81.     All of the claims for Fraudulent Services identified in Exhibit "2" for services that purportedly were provided in New York were provided in violation of New York licensing laws, because Gerling Institute lacked the authority to operate as a medical practice in New York.

**B.      NY Orthopedics' Unlawful Operations in New Jersey**

82.      As set forth above, pursuant to N.J.S.A 14A:17-5, a foreign professional corporation cannot provide professional services in the State of New Jersey without being properly incorporated under New Jersey law.

83.      As discussed above, NY Orthopedics was a New York medical professional corporation. NY Orthopedics was not and has never been a New Jersey medical professional corporation. NY Orthopedics was never incorporated as a professional corporation under New Jersey law.

84.      Accordingly, NY Orthopedics could not lawfully provide medical or other professional services in the state of New Jersey.

85.      Even so, in the claims identified in Exhibit "1", Gerling routinely caused NY Orthopedics to unlawfully provide purported medical services in New Jersey, which then were billed to GEICO.

86.      In particular, between December 2014 and October 2022, Gerling and the Gerling Institute submitted more than $300,000.00 in billing to GEICO for services unlawfully provided – to the extent they were provided at all – through Gerling Institute in New York.

87.      All of the claims for Fraudulent Services identified in Exhibit "1" for services that purportedly were provided in New Jersey were provided in violation of New Jersey law, because NY Orthopedics lacked the ability to lawfully operate as a medical practice in New Jersey.

**C.      The Defendants' Unlawful Patient Brokering Scheme**

88.      As set forth above, in August 2022, the Honorable I. Leo Glasser granted GEICO summary judgment on its civil RICO conspiracy and aiding and abetting fraud claims against

Dovman for Dovman's involvement in a large-scale insurance fraud scheme involving kickbacks and patient brokering.

89.     Dovman has continued his involvement in unlawful patient brokering schemes.

90.     For instance, beginning in 2021, Dovman controlled a shell company called AK Advertising, Inc. ("AK Advertising").

91.     Moreover, between at least 2021 and 2022, Dovman, together with his associate, Gran, was in control of two additional shell companies – Presico, Inc. ("Presico") and Defendant Campiro – which he and Gran used to funnel payments to, among others, automobile accident victims and physicians.

92.     In order to fund the Presico and Campiro bank accounts, Dovman and Gran solicited payments from a series of personal injury attorneys, who forwarded payments to AK Advertising for putative "advertising" services.

93.     However, AK Advertising was never a legitimate advertising company, and never provided the personal injury attorneys with any legitimate advertising services.

94.     Instead, the payments from the personal injury attorneys to AK Advertising were in exchange for Dovman and Gran unlawfully "brokering" automobile accident victims to the personal injury attorneys.

95.     Upon their receipt of the phony "advertising" payments from, among others, the personal  injury attorneys, Dovman and AK Advertising caused those funds to be transferred to the accounts for Presico and Campiro.

96.     Once the patients were referred by Dovman and Gran to the personal injury attorneys, those attorneys, Dovman, and Gran would cause the patients to enter into financial agreements with Presico and Campiro, whereby: (i) the patients would receive cash advances against their prospective

personal injury case settlements, which were often tied to the patients' willingness to undergo invasive, expensive, and medically unnecessary surgeries; and (ii) Presico and Campiro would issue payments – using the funds paid to AK Advertising by the personal injury attorneys representing the patients – to surgeons to incentivize those surgeons to perform invasive, expensive, and medically unnecessary surgeries.

97.    Gerling was among the surgeons who, in exchange for payments from Campiro, agreed to perform invasive, expensive, and medically unnecessary surgeries on automobile accident patients.

98.    Gerling knew the surgeries he performed on these patients were  invasive, expensive, and medically unnecessary. Therefore, Gerling entered into an agreement with Dovman, Gran, and Campiro whereby: (i) Dovman, Gran, Campiro, and the various personal injury attorneys would cause patients to be referred to Gerling and NY Orthopedics for surgical procedures; (ii) Dovman, Gran, and Campiro would pay Gerling to perform invasive, expensive, and medically unnecessary surgeries; and (iii) in exchange, and as compensation for the referral, Gerling would perform expensive and medically unnecessary surgical procedures.

99.    At the same time they remitted payment to Gerling for the surgeries, Dovman, Gran, and Campiro would also simultaneously issue a payment to the patient directly as an incentive to undergo the procedure.

100.    Rather than to treat or otherwise benefit the surgical patients, the surgical procedures performed by Gerling as part of his agreement with Dovman, Gran, and Campiro were designed to: (i) create billing opportunities for Gerling and his practices, including NY Orthopedics; and (ii) artificially drive up the supposed value of the patients' prospective personal injury settlements.

101. For instance, on or about August 17, 2021, Gerling and NY Orthopedics provided a patient named LM with an anterior cervical discectomy and fusion for injuries supposedly suffered by LM in an automobile accident on October 27, 2020.

102. As an incentive to perform the surgery in the first instance, Dovman, Gran, and Campiro paid NY Orthopedics $33,650.00, as shown in the following check:



103. That same day, Dovman, Gran, and Campiro paid LM a $5,000.00 purported "loan" as compensation for receiving the discectomy and fusion surgery from Gerling and NY Orthopedics:

104. This practice – whereby Gerling and NY Orthopedics were compensated by Dovman, Gran, and Campiro for providing surgeries – was carried out regularly between 2021 and 2022, including the following:

(i) On February 11, 2021, Dovman, Gran, and Campiro paid Gerling and NY Orthopedics $25,000.00 for an anterior cervical discectomy and fusion provided by Gerling and NY Orthopedics to a patient named WM;

(ii)     On April 30, 2021, Dovman, Gran, and Campiro paid Gerling and NY Orthopedics $25,000.00 for an anterior cervical discectomy and fusion provided by Gerling and NY Orthopedics to a patient named LN;

(iii)    On July 19, 2021, Dovman, Gran, and Campiro paid Gerling and NY Orthopedics $25,000.00 for a cervical fusion provided by Gerling and NY Orthopedics to a patient named RM; and

(iv)    On September 28, 2021, Dovman, Gran, and Campiro paid Gerling and NY Orthopedics $19,500.00 for a lumbar discectomy provided by Gerling and NY Orthopedics to a patient named NM.

105.     These are only representative examples.

106.     A legitimate physician and medical practice providing medically necessary surgical procedures on genuinely injured automobile accident victims would not have any need for compensation for those services from, among others, Dovman, who was one of the conspirators in another multi-million-dollar insurance fraud/racketeering/patient brokering scheme.

107.     In fact, the surgeries provided by and through Gerling and his practices were not medically necessary procedures, and Gerling accepted unlawful payments from Dovman, Gran, and Campiro as incentives to perform the unnecessary surgeries.

## C.     The Payment and Receipt of Unlawful Compensation in Exchange for Patient Referrals

108.     In order to bill GEICO and other automobile insurers for the Fraudulent Services, Gerling, NY Orthopedics, Gerling Institute, and Spine Health needed to obtain patient referrals from other health care providers.

109.     Toward that end, Gerling, NY Orthopedics, Gerling Institute, and Spine Health entered into secret agreements with a series of health care providers, whereby those health care providers would refer Insureds to Gerling, NY Orthopedics, Gerling Institute, and Spine Health for purported surgical procedures in exchange for unlawful compensation from Gerling, NY

Orthopedics, Gerling Institute, and Spine Health.

110.    The unlawful compensation was provided in the form of: (i) ostensibly legitimate payments to "lease" space and personnel at, among other locations, Garden State Pain's offices located at 1117 US Highway 46 East, Suite 202, Clifton, New Jersey; and/or (ii) permitting one of Garden State Pain's employees, Andrew So, M.D. ("So') to serve as the purported "co" or "assistant" surgeon on the resulting surgical procedures provided through Gerling, NY Orthopedics, Gerling Institute, and Spine Health, despite the fact that So was unqualified by training or education to participate in the surgeries as a "co" or "assistant" surgeon.

111.    In reality, these were "pay-to-play" arrangements that caused Garden State Pain and the Sinhas to provide access to Insureds and refer Insureds to Gerling, NY Orthopedics, Gerling Institute, and Spine Health for medically unnecessary, invasive, and expensive spinal surgeries.

112.    The amount of the purported "lease" payments that Gerling, NY Orthopedics, Gerling Institute, and Spine Health was based on the volume of Insureds that Garden State Pain and the Sinhas referred to Gerling, NY Orthopedics, Gerling Institute, and Spine Health.

113.    In keeping with the fact that the payments that Gerling, NY Orthopedics, Gerling Institute, and Spine Health made to Garden State Pain and the Sinhas constituted illegal referral fees, rather than legitimate lease payments, the putative "rent" was not a fixed fee set in advance, and did not cover any regular lease term. See N.J.A.C. 13:35-6.17(h).

114.    In further keeping with the fact that the putative "rent" payments were not for fixed fees set in advance, and did not cover any regular lease terms, Gerling, NY Orthopedics, Gerling Institute, and Spine Health did not operate from the offices of Garden State Pain and the Sinhas on a regular, consistent basis. Instead, they would only appear at the offices of Garden State Pain

and the Sinhas, and would only make the purported "rent" payments to Garden State Pain and the Sinhas on dates when Garden State Pain and the Sinhas had patients to refer to them for the Fraudulent Services.

115.   Once Garden State Pain and the Sinhas had referred Insureds to Gerling, NY Orthopedics, Gerling Institute, and Spine Health for purported surgical procedures, Gerling, Gerling Institute, and Spine Consult would oftentimes permit Garden State Pain's employee, So, to serve as the purported "co" or "assistant" surgeon on the resulting surgical procedures despite the fact that So was unqualified by training or education to participate in the surgeries as a "co" or "assistant" surgeon.

116.   To be qualified to participate in spinal surgical procedures, a physician typically must – at a minimum – complete a residency in orthopedic surgery or neurosurgery.

117.   However, So was not qualified by training or education to serve as Gerling's "assistant surgeon" or "co-surgeon".

118.   So never completed a residency in either orthopedic surgery or neurosurgery.

119.   To the extent he held any legitimate board certification, So was board certified in anesthesiology.

120.   So was not an orthopedic surgeon, a neurosurgeon, or any other type of surgeon.

121.   Nothing in So's training or medical education qualified him to participate as a surgeon in spinal surgical procedures of any type, whether as a primary surgeon or "co-surgeon".

122.   In fact, So played no genuine role in performing surgical procedures that were billed through Gerling Institute or Spine Consult to GEICO, either as a primary surgeon, "co-surgeon", "assistant surgeon", or otherwise.

123.    Even so, as compensation for the underlying referrals of Insureds from Garden State and the Sinhas to Gerling, NY Orthopedics, Gerling Institute, and Spine Health, Gerling, Gerling Institute, and Spine Consult permitted So to falsely purport to serve as "co-surgeon" or "assistant surgeon" on the surgeries – allowing Garden State and the Sinhas a billing opportunity for the surgeries.

124.    For example:

(i)     On February 9, 2022, Gerling and Gerling Institute purported to provide an anterior cervical disc fusion procedure on an Insured named JD, who had been referred to Gerling Institute and Gerling by N. Sinha, D. Sinha, and Garden State Pain. In exchange for the referral from N. Sinha, D. Sinha, and Garden State Pain to Gerling and Gerling Institute permitted N. Sinha, D. Sinha, and Garden State Pain to bill for their employee, So, to falsely purport to serve as " co-surgeon/assistant" on the disc fusion procedure, despite the fact that So was unqualified to serve – and did not legitimately serve – as "assistant" or "co" surgeon  the surgery.

(ii)    On March 2, 2022, Gerling and Gerling Institute purported to provide an anterior cervical disc fusion procedure on an Insured named JM, who had been referred to Gerling Institute and Gerling by N. Sinha, D. Sinha, and Garden State Pain. In exchange for the referral from N. Sinha, D. Sinha, and Garden State Pain to Gerling and Gerling Institute permitted N. Sinha, D. Sinha, and Garden State Pain to bill for their employee, So, to falsely purport to serve as " co-surgeon/assistant" on the disc fusion procedure, despite the fact that So was unqualified to serve – and did not legitimately serve – as "assistant" or "co" surgeon  the surgery.

(iii)   On June 22, 2022, Gerling and Gerling Institute purported to provide an anterior cervical disc fusion procedure on an Insured named VC, who had been referred to Gerling Institute and Gerling by N. Sinha, D. Sinha, and Garden State Pain. In exchange for the referral from N. Sinha, D. Sinha, and Garden State Pain to Gerling and Gerling Institute permitted N. Sinha, D. Sinha, and Garden State Pain to bill for their employee, So, to falsely purport to serve as " co-surgeon/assistant" on the disc fusion procedure, despite the fact that So was unqualified to serve – and did not legitimately serve – as "assistant" or "co" surgeon  the surgery.

125.    These are only representative examples. In the claims for surgical procedures identified in Exhibits "2" and "4", Gerling, Gerling Institute, and Spine Consult permitted unqualified anesthesiologists to falsely pose as "assistant surgeon" or "co-surgeon" on the spinal

surgeries as unlawful compensation for the underlying of Insureds from Garden State Pain and the Sinhas to Gerling Institute or Spine Consult.

**D.     The Fraudulent Charges for Initial Examinations**

126.     As an initial step in their fraudulent billing and treatment protocol, the Defendants purported to provide virtually every Insured in the claims identified in Exhibits "1" – "3" with an initial examination.

127.     As set forth in Exhibit "1", Gerling and Pyun purported to perform the majority of the putative initial examinations on behalf of NY Orthopedics, which Gerling and NY Orthopedics billed to GEICO using CPT codes 99244, 99245, 99204, and 99205, typically resulting in a charge of between $148.69 and $850.00 for each purported examination.

128.     As set forth in Exhibit "2", Gerling purported to perform the majority of the putative initial examinations on behalf of Gerling Institute, which Gerling and Gerling Institute billed to GEICO using CPT codes 99244, 99245, and 99204, typically resulting in a charge of between $193.64 and $1,653.00 for each purported examination.

129.     As set forth in Exhibit "3", Pyun purported to perform the majority of the putative initial examinations on behalf of  Spine Health, which Gerling and Spine Health billed to GEICO using CPT codes 99244, 99245, 99204, and 99205, typically resulting in a charge of between $148.69 and $700.00 for each purported examination.

130.     In the claims for initial examinations identified in Exhibits "1" – "3", the charges for the initial examinations were fraudulent in that they misrepresented NY Orthopedics, Gerling Institute, and Spine Health's eligibility to collect PIP Benefits in the first instance.

131.     In fact, NY Orthopedics, Gerling Institute, and Spine Health were not eligible to collect PIP Benefits in the claims for initial examinations that are identified in Exhibits "1" – "3"

because – as a result of the fraudulent and unlawful scheme described herein – neither NY Orthopedics, Gerling Institute, Spine Health nor the examinations were in compliance with all significant laws and regulations or licensing laws governing health care practice and/or licensing laws.

132.     Moreover, and as set forth below, the charges for the initial examinations also were fraudulent in that they misrepresented the extent, nature, and results of the initial examinations.

**1.     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

133.     For instance, in the claims for initial examinations under CPT codes 99204, 99205, 99244, and 99245 that are identified in Exhibits "1" – "3", the Defendants routinely misrepresented the severity of the Insureds' presenting problems.

134.     At all relevant times, pursuant to the American Medical Association's CPT Assistant, which is incorporated by reference into the NY and NJ Fee Schedule, the use of CPT codes 99205, 99204, 99245, or 99244 to bill for an initial patient examination typically required that the patient present with problems of moderate to high severity.

135.     The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT codes 99205, 99204, 99245, or 99244 to bill for an initial patient examination.

136.     For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99204 to bill for an initial patient examination:

(i)     Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)     Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)   Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv)   Initial office visit for 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v)   Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)   Initial office evaluation of 70-year-old female with polyarthralgia. (Rheumatology)

(vii)   Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

137.   Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT codes 99205, 99204, 99245, or 99244 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

138.   By contrast, to the extent that the Insureds in the claims identified in Exhibits "1" – "3" had any presenting problems at all as the result of their relatively minor automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as sprains and strains.

139.   For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibits "1" – "3" either had no presenting problems at all as the result of their relatively minor automobile accidents, or else problems of low or minimal severity, in the majority of the claims identified in Exhibits "1" – "3" the Insureds did not seek treatment at any hospital as the result of their accidents.

140.   To the limited extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain or strain and/or similar soft-tissue injury diagnosis.

141.    Furthermore, in many cases, contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents or injured at all.

142.    Even so, in the claims for initial examinations identified in Exhibits "1" – "3", NY Orthopedics, Gerling Institute, Spine Health, Gerling, and Pyun routinely billed for their putative initial examinations using CPT codes 99204, 99205, 99244, or 99245 and thereby falsely represented that the Insureds presented with problems of moderate to high severity.

143.    For example:

(i)     On April 5, 2017, an Insured named VK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that VK's vehicle was drivable following the accident. The police report further indicated that VK was not injured in the accident and did not complain of any pain at the scene. In keeping with the fact that VK was not seriously injured in the accident, VK did not visit any hospital emergency room following the accident. To the extent that VK experienced any health problems at all following the accident, they were of low or minimal severity. Even so, at the conclusion of a purported initial examination of VK on June 6, 2017, Gerling and NY Orthopedics billed GEICO for the initial examination using CPT code 99204 and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ii)    On September 23, 2017, an Insured named EM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EM's vehicle was drivable following the accident. The police report further indicated that EM was not injured in the accident and did not complain of any pain at the scene. In keeping with the fact that EM was not seriously injured, EM did not visit any hospital emergency room following the accident. To the extent that EM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Even so, at the conclusion of a purported initial examination of EM on August 13, 2018 – nearly 11 months after the accident – Gerling, Pyun, and NY Orthopedics billed GEICO for the initial examination using CPT code 99204 and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

29

(iii)    On February 14, 2018, an Insured named MB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MB's vehicle was drivable following the accident. The police report further indicated that MB was not injured in the accident and did not complain of any pain at the scene. To the extent that MB experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Even so, at the conclusion of a purported initial examination of MB on November 9, 2018 – nearly nine months after the accident – Gerling and NY Orthopedics billed GEICO for the initial examination using CPT code 99204 and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iv)    On May 31, 2018, an Insured named JP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JP's vehicle was drivable following the accident. The police report further indicated that JP was not injured in the accident and did not complain of any pain at the scene. In keeping with the fact that LA was not seriously injured in the accident, JP did not visit any hospital emergency room following the accident. To the extent that JP experienced any health problems at all following the accident, they were of low or minimal severity at the outset and improved over time. Even so, at the conclusion of a purported initial examination of JP on August 6, 2019 – more than one year after the accident – Gerling and NY Orthopedics billed GEICO for the initial examination using CPT code 99244 and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(v)    On August 27, 2018, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that AM's vehicle was drivable following the accident. The police report further indicated that AM was not injured in the accident and did not complain of any pain at the scene. In keeping with the fact that AM was not seriously injured, AM did not visit any hospital emergency room following the accident. To the extent that AM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Even so, at the conclusion of a purported initial examination of AM on May 28, 2019 – nine months after the accident – Gerling and NY Orthopedics billed GEICO for the initial examination using CPT code 99204 and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vi)    On October 3, 2018, an Insured named RG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that RG's vehicle was drivable following the accident. The police report further indicated that RG was not injured in the accident. Later that day, RG traveled on his own to Richmond University Hospital. The contemporaneous hospital records indicated that RG was briefly observed on an outpatient basis and

was discharged that same day with a neck and back strain diagnosis. To the extent that RG experienced any health problems at all following the accident, they were of low or minimal severity. Even so, at the conclusion of a purported initial examination of RG on January 25, 2019, Gerling, Pyun, and NY Orthopedics billed GEICO for the initial examination using CPT code 99204 and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vii)  On December 17, 2018, an Insured named VS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that VS's vehicle was drivable following the accident. The police report further indicated that VS was not injured and did not complain of any pain at the scene. Later that day, VS traveled on his own to Montefiore Hospital. The contemporaneous hospital records indicated that VS was briefly observed on an outpatient basis and was discharged that same day with a neck and back pain diagnosis. To the extent that VS experienced any health problems at all following the accident, they were of low or minimal severity at the outset and improved over time. Even so, at the conclusion of a purported initial examination of VS on July 30, 2019 – more than nine months after the accident – Gerling and NY Orthopedics  billed GEICO for the initial examination using CPT code 99204 and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(viii)  On March 23, 2019, an Insured named TR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that TR's vehicle was drivable following the accident. The policy report further indicated that TR was not injured and did not complain of any pain at the scene. Thereafter, TR traveled on his own to University Hospital of Brooklyn. The contemporaneous hospital records indicated that TR was briefly observed on an outpatient basis and discharged with a neck and back strain diagnosis. To the extent that TR experienced any health problems at all following the accident, they were of low or minimal severity at the outset and improved over time. Even so, at the conclusion of a purported initial examination of TR on April 20, 2021 – more than a year and a half after the accident –  Gerling and Gerling Institute billed GEICO for the initial examination using CPT code 99205 and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ix)  On August 4, 2019, an Insured named LK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that LK's vehicle was drivable following the accident. The police report further indicated that LK was not injured in the accident and did not complain of any pain at the scene. In keeping with the fact that LA was not seriously injured in the accident, LK did not visit any hospital emergency room following the accident. To the extent that LK experienced any health problems at all following the accident, they were of low or minimal severity at the outset and

improved over time. Even so, at the conclusion of a purported initial examination of LK on March 17, 2021 – <u>more than a year and a half</u> after the accident – Gerling and Gerling Institute billed GEICO for the initial examination using CPT code 99244 and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(x)   On August 8, 2019, an Insured named AN was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that AN's vehicle was drivable following the accident. The police report further indicated that AN was not injured in the accident and did not complain of any pain at the scene. Later that day, AN traveled on her own to Brookdale Hospital. The contemporaneous hospital records indicated that AN was briefly observed on an outpatient basis, and was discharged with a minor back/neck pain and headache diagnosis. To the extent that AN experienced any health problems at all following the accident, they were of low or minimal severity at the outset and improved over time. Even so, at the conclusion of a purported initial examination of AN on April 20, 2021 – <u>more than a year and a half</u> after the accident –  Gerling and NY Orthopedics billed GEICO for the initial examination using CPT code 99244 and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xi)   On September 21, 2019, an Insured named LA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that LA's vehicle was drivable following the accident. The police report further indicated that LA was not injured in the accident and did not complain of any pain at the scene. In keeping with the fact that LA was not seriously injured, LA did not visit any hospital emergency room following the accident. To the extent that LA experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Even so, at the conclusion of a purported initial examination of LA on June 5, 2020 – more than eight months after the accident – Gerling and Gerling Institute billed GEICO for the initial examination using CPT code 99244 and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xii)   On October 20, 2019, an Insured named GR was involved in an automobile accident. The contemporaneous police report indicated that GR was not injured in the accident and did not complain of any pain at the scene. In keeping with the fact that GR was not seriously injured in the accident, GR did not visit any hospital emergency room following the accident. To the extent that GR experienced any health problems at all following the accident, they were of low or minimal severity at the outset and improved over time. Even so, at the conclusion of a purported initial examination of GR on March 16, 2021 – more than one year after the accident – Gerling and NY Orthopedics billed GEICO for the initial examination using CPT code 99205 and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

32

(xiii)   On October 23, 2019, an Insured named MJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MJ's vehicle was drivable following the accident. The police report further indicated that MJ was not injured in the accident and did not complain of any pain at the scene. Later that day, MJ traveled on her own to Holy Name Medical Center. The contemporaneous hospital records indicated that MJ was briefly observed on an outpatient basis, and was discharged that same day with an ear pain diagnosis. To the extent that MJ experienced any health problems at all following the accident, they were of low or minimal severity at the outset and improved over time. Even so, at the conclusion of a purported initial examination of MJ on May 5, 2021 – <u>more than a year and a half</u> after the accident – Gerling and Gerling Institute billed GEICO for the initial examination using CPT code 99245 and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xiv)   On November 4, 2020, an Insured named CL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that CL's vehicle was drivable following the accident. In keeping with the fact that CL was not seriously injured in the accident, CL did not visit any hospital emergency room following the accident. To the extent that CL experienced any health problems at all following the accident, they were of low or minimal severity. Even so, at the conclusion of a purported initial examination of CL on April 8, 2021, Gerling, Pyun, and Spine Health billed GEICO for the initial examination using CPT code 99205 and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xv)   On December 30, 2020, an Insured named EC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EC's vehicle was drivable following the accident. The police report further indicated that EC was not injured and did not complain of any pain at the scene. Later that day, EC traveled on her own to Mount Sinai Hospital in Brooklyn. The contemporaneous hospital records indicated that EC was briefly observed on an outpatient basis, and was discharged that day with a neck sprain diagnosis. To the extent that EC experienced any health problems at all following the accident, they were of low or minimal severity. Even so, at the conclusion of a purported initial examination of EC on April 30, 2021, Gerling and NY Orthopedics billed GEICO for the initial examination using CPT code 99244 and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xvi)   On April 12, 2021, an Insured named OO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that OO's vehicle was drivable following the accident. In keeping with the fact that OO was not seriously injured, OO did not visit any hospital

emergency room following the accident. To the extent that OO experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, at the conclusion of a purported initial examination of OO on September 14, 2021, Gerling and NY Orthopedics billed GEICO for the initial examination using CPT code 99244 and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xvii)   On June 7, 2021, an Insured named AK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AK's vehicle was drivable following the accident. The police report further indicated that AK was not injured in the accident and did not complain of any pain at the scene. In keeping with the fact that AK was not seriously injured in the accident, AK did not visit any hospital emergency room following the accident. To the extent that AK experienced any health problems at all following the accident, they were of low or minimal severity at the outset and improved over time. Even so, at the conclusion of a purported initial examination of AK on November 12, 2021 – more than five months after the accident – Gerling and NY Orthopedics billed GEICO for the initial examination using CPT code 99244 and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xviii)   On March 20, 2021, an Insured named PV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that PV's vehicle was drivable following the accident. The police report further indicated that PV was not injured in the accident and did not complain of any pain at the scene. In keeping with the fact that GR was not seriously injured in the accident, PV did not visit any hospital emergency room following the accident. To the extent that PV experienced any health problems at all following the accident, they were of low or minimal severity. Even so, at the conclusion of a purported initial examination of PV on July 9, 2021, Gerling and NY Orthopedics billed GEICO for the initial examination using CPT code 99205 and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xix)   On July 27, 2021, an Insured named JZ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that JZ's vehicle was drivable following the accident. JZ traveled by ambulance to Bellevue Hospital following the accident. The contemporaneous hospital records indicated that JZ was observed on an outpatient basis and was discharged with a back pain diagnosis. To the extent that JZ experienced any health problems at all following the accident, they were of low or minimal severity at the outset and improved over time. Even so, at the conclusion of a purported initial examination of JZ on September 9, 2022 – more than one year after the accident – Gerling and NY Orthopedics billed GEICO for the initial examination using CPT code 99245 and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xx)    On November 5, 2021, an Insured named CG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that CG's vehicle was drivable following the accident. Later that day, CG traveled on her own to Kingsbrook Jewish Medical Center. The contemporaneous hospital records indicated that CG was briefly observed on an outpatient basis, and was discharged with a back pain diagnosis. To the extent that CG experienced any health problems at all following the accident, they were of low or minimal severity. Even so, at the conclusion of a purported initial examination of CG on January 25, 2019, Gerling and NY Orthopedics billed GEICO and NY Orthopedics billed GEICO for the initial examination using CPT code 99244 and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

144.    These are only representative examples. In the claims for initial examinations identified in Exhibits "1" – "3", Gerling, Pyun, NY Orthopedics, Gerling Institute, and Spine Health routinely falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were low or minimal severity soft tissue injuries such as sprains and strains, to the extent that they had any presenting problems at all at the time of the putative examinations.

145.    In the claims for initial examinations identified in Exhibits "1" – "3", Gerling, Pyun, NY Orthopedics, Gerling Institute, and Spine Health falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for their charges for the putative examinations under CPT codes 99204, 99205, 99244, and 99245 because examinations billable under CPT codes 99204, 99205, 99244, and 99245 are reimbursable at a higher rate than examinations involving presenting problems of low severity, minimal severity, or no severity.

146.    In the claims for initial examinations identified in Exhibits "1" – "3", Gerling, Pyun, NY Orthopedics, Gerling Institute, and Spine Health also routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

2.      **Misrepresentations Regarding the Amount of Time Spent on the Purported Examinations**

147.    Pursuant to the NY and NJ Fee Schedule, the use of CPT codes 99204, 99205, 99244, and 99245 to bill for an initial examination represents that the physician or other health care provider who performed the examination spent at least: (i) 45 minutes of face-to-face time with the patient or the patient's family when the examination was billed under CPT code 99204; (ii) 60 minutes of face-to-face time with the patient or the patient's family when the examination was billed under CPT codes 99244 99205; and (iii) 80 minutes of face-to-face time with the patient or the patient's family when the examination was billed under CPT code 99245.

148.    However, in the claims for initial examinations identified in Exhibits "1" – "3", neither Gerling, Pyun, nor any other physician associated with NY Orthopedics, Gerling Institute, or Spine Health ever spent 45 minutes of face-to-face time with the Insureds or their families when conducting the examinations, much less 60 or 80 minutes.

149.    Rather, in the claims for initial examinations identified in Exhibits "1" – "3", the initial examinations did not entail more than 20 minutes of face-to-face time between the examining health care practitioner and the Insureds or their families, to the extent that the examinations actually were performed in the first instance.

150.    For instance, and in keeping with the fact that the initial examinations allegedly provided by Gerling or Pyun did not entail more than 20 minutes of face-to-face time with the Insureds or their families, Gerling and Pyun used template forms in purporting to conduct the initial examinations.

151.    The template forms that Gerling and Pyun used to document the putative examinations included boilerplate language cut-and-pasted from report to report.

152.     All that was required to complete the template forms was a brief patient interview and a brief physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, basic range of motion and muscle strength testing, and other limited examinations of the Insureds' musculoskeletal systems.

153.     These interviews and examinations did not require any physician or health care practitioner associated with NY Orthopedics, Gerling Institute, or Spine Health to spend more than 20 minutes of face-to-face time with the Insureds during the putative initial examinations.

154.     In the claims for initial examinations identified in Exhibits "1" – "3", NY Orthopedics, Gerling Institute, Spine Health, Gerling, and Pyun falsely represented that the examinations involved extended amounts of face-to-face time with the Insureds or their families in order to create a false basis for their charges under CPT codes 99204, 99205, 99244, and 99245 because examinations billable under CPT codes 99204, 99205, 99244, and 99245 are reimbursable at a higher rate than examinations that require less time to perform.

**3.     Misrepresentations Regarding "Detailed" or "Comprehensive" Physical Examinations**

155.     Moreover, in the claims identified in Exhibits "1" – "3" for initial examinations under CPT codes 99204, 99205, 99244, and 99245, NY Orthopedics, Gerling Institute, Spine Health, Gerling, and Pyun routinely falsely represented the nature and extent of the underlying physical examinations.

156.     Pursuant to the CPT Assistant, the use of CPT codes 99204, 99205, 99244, or 99245 to bill for a patient examination represented that the physician who performed the examination conducted a "comprehensive" physical examination.

157.    A physical examination does not qualify as "comprehensive" unless the examining physician either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

158.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a general examination of multiple patient organ systems unless the physician has documented findings with respect to at least eight organ systems.

159.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)     at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)  coordination, deep tendon reflexes, and sensation; and

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

160.    In the claims for initial examinations identified in Exhibits "1" – "3", when NY Orthopedics, Gerling Institute, Spine Health, Gerling, and Pyun billed for the initial examinations under CPT codes 99204, 99205, 99244, and 99245, they falsely represented that Gerling, Pyun, or some other health care practitioner associated with NY Orthopedics, Gerling Institute, or Spine Health performed "comprehensive" patient examinations on the Insureds they purported to treat during the initial examinations.

161.    In fact, with respect to the claims for initial examinations under CPT codes 99204, 99205, 99244, and 99245 that are identified in Exhibits "1" – "3", neither Gerling, Pyun, nor any other health care practitioner associated with NY Orthopedics, Gerling Institute, or Spine Health actually conducted a general examination of multiple patient organ systems, or conducted a complete examination of a single patient organ system.

162.    For instance, in the claims under CPT codes 99204, 99205, 99244, and 99245 identified in Exhibits "1" – "3", neither Gerling, Pyun, nor any other health care practitioner associated with NY Orthopedics, Gerling Institute, or Spine Health conducted any general examination of multiple patient organ systems, inasmuch as they did not document findings with respect to at least eight organ systems.

163.    Furthermore, although Gerling and Pyun typically purported to provide an examination of the Insureds' musculoskeletal systems in many of the claims for initial examinations identified in Exhibits "1" – "3", the musculoskeletal examinations did not qualify as "complete", because they failed to document:

(i)     at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)   palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)   examination of gait and station;

(vi)   examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)   coordination, deep tendon reflexes, and sensation; and/or

(ix)   mental status, including orientation to time, place and person, as well as mood and affect.

164.   For example:

(i)   On July 20, 2018, Gerling and NY Orthopedics billed GEICO under CPT code 99204 for an initial examination of an Insured named MW, and thereby represented that they had provided a "comprehensive" physical examination to MW.  However, neither Gerling nor any other health care practitioner associated with NY Orthopedics documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(ii)   On November 30, 2018, Gerling and NY Orthopedics billed GEICO under CPT code 99205 for an initial examination of an Insured named PG, and thereby represented that they had provided a "comprehensive" physical examination to PG. However, neither Gerling nor any other health care practitioner associated with NY Orthopedics documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(iii)   On November 10, 2020, Gerling, Pyun, and Spine Health billed GEICO under CPT code 99244 for an initial examination of an Insured named LF, and thereby represented that they had provided a "comprehensive" physical examination to LF. However, neither Gerling, Pyun, nor any other health care practitioner associated with Spine Health documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the

Insured's musculoskeletal systems or any of the Insured's other organ systems.

(iv)     On August 23, 2021, Gerling, Pyun, and Spine Health billed GEICO under CPT code 99245 for an initial examination of an Insured named AC, and thereby represented that they had provided a "comprehensive" physical examination to AC. However, neither Gerling, Pyun, nor any other health care practitioner associated with Spine Health documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(v)      On May 18, 2022, Gerling and Gerling Institute billed GEICO under CPT code 99245 for an initial examination of an Insured named BM, and thereby represented that they had provided a "comprehensive" physical examination to BM.  However, neither Gerling nor any other health care practitioner associated with Gerling Institute documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's other organ systems.

165.     These are only representative examples. In the claims for initial examinations under CPT codes 99204, 99205, 99244, and 99245 identified in Exhibits "1" – "3", NY Orthopedics, Gerling Institute, Spine Health, Gerling, and Pyun routinely falsely represented that they had provided "comprehensive" physical examinations. In fact, they had not provided comprehensive physical examinations because the examining physician had not documented: (i) a general examination of multiple patient organ systems; or (ii) a complete examination of a single patient organ system.

**4.     Misrepresentations Regarding the Extent of Medical Decision-Making**

166.     Pursuant to the NY and NJ Fee Schedules, the use of CPT codes 99204 and 99244 to bill for a patient examination represents that the physician who performed the examination engaged in legitimate, "moderate complexity" medical decision-making.

167.     Moreover, pursuant to the NY and NJ Fee Schedules,  the use of CPT codes 99205 and 99245 to bill for a patient examination represents that the physician who performed the examination engaged in legitimate, "high complexity" medical decision-making.

168. Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

169. As set forth above, pursuant to the CPT Assistant, the presenting problems that could require legitimate moderate or high complexity medical decision-making, and therefore support the use of CPT codes 99204, 99205, 99244, and 99245 to bill for an initial examination, typically are problems that pose a serious threat to the patient's health, or even the patient's life.

170. By contrast, to the extent that the Insureds in the claims identified in Exhibits "1" – "3" had any presenting problems at all as the result of their relatively minor automobile accidents, the problems virtually always were minor soft tissue injuries such as sprains and strains.

171. The diagnosis and treatment of these minor soft tissue injuries did not require any legitimate, moderate or high complexity medical decision-making.

172. First, when the Insureds in the claims identified in Exhibits "1" – "3" presented to NY Orthopedics, Gerling Institute, Spine Health, Gerling, and Pyun for "treatment", NY Orthopedics, Gerling Institute, Spine Health, Gerling, and Pyun did not review any significant amount of the Insureds' preexisting medical records.

173. Furthermore, prior to the initial examinations, NY Orthopedics, Gerling Institute, Spine Health, Gerling, and Pyun did not request any medical records from any other providers.

174. Second, in NY Orthopedics, Gerling Institute, Spine Health, Gerling, and Pyun's claims for initial examinations identified in Exhibits "1" – "3", there was no risk of significant

complications or morbidity – much less mortality – from the Insureds' relatively minor soft tissue injury complaints to the extent that they ever had any complaints arising from automobile accidents at all.

175.    Third, in NY Orthopedics, Gerling Institute, Spine Health, Gerling, and Pyun's claims for initial examinations identified in Exhibits "1" – "3", NY Orthopedics, Gerling Institute, Spine Health, Gerling, and Pyun did not consider any significant number of diagnoses or treatment options for the Insureds during the initial examinations.

176.    Specifically, in the vast majority of claims identified in Exhibits "1" – "3", during the initial examinations the Insureds did not present with any significant continuing medical problems that legitimately could be traced to an underlying automobile accident.

177.    Even so, NY Orthopedics, Gerling Institute, Spine Health, Gerling, and Pyun prepared initial examination reports in which they provided a phony series of spinal injuries, which they used as a false basis for the referrals for surgical procedures.

178.    Based upon these phony "diagnoses", NY Orthopedics and Gerling directed Insureds to undergo spinal surgical procedures such as discectomies, laminotomies, and anterior cervical disc fusion procedures, regardless of whether those procedures were warranted in the first instance.

179.    For example:

(i)    On July 26, 2018, an Insured named SC was involved in an automobile accident. The contemporaneous police report indicated that SC's vehicle was drivable following the accident. The police report further indicated that SC was not injured and did not complain of any pain at the scene of the accident. In keeping with the fact that SC was not seriously injured, SC did not visit any hospital emergency room following the accident. To the extent that SC experienced any health problems at all as the result of the accident, they were of low severity. On February 20, 2019, Gerling purported to conduct an initial examination of SC at NY Orthopedics. Gerling did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gerling provided SC with

substantially the same cervical and lumbar soft tissue injury "diagnosis" that he provided to virtually every other Insured, and referred SC to Spine Consult for a medically unnecessary discectomy. NY Orthopedics and Gerling billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Gerling engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ii)     On October 30, 2018, an Insured named JS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JS's vehicle was drivable following the accident. The police report further indicated that JS was not injured and did not complain of any pain at the scene of the accident. In keeping with the fact that JS was not seriously injured, JS did not visit any hospital emergency room following the accident. To the extent that JS experienced any health problems at all as the result of the accident, they were of low severity. On January 11, 2019, Gerling purported to conduct an initial examination of JS at NY Orthopedics. Gerling did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gerling provided JS with substantially the same cervical and lumbar soft tissue injury "diagnosis" that he provided to virtually every other Insured, and referred JS to Spine Consult for a medically unnecessary transforaminal lumbar interbody fusion. NY Orthopedics and Gerling billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Gerling engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iii)    On December 17, 2018, an Insured named VS was involved in an automobile accident. The contemporaneous police report indicated that VS's vehicle was drivable following the accident. The police report further indicated that VS was not injured and did not complain of any pain at the scene of the accident. Later that day, VS traveled on his own to Montefiore Hospital. The contemporaneous hospital records indicated that VS was briefly observed on an outpatient basis, and was discharged with a minor neck and back pain diagnosis. To the extent that VS experienced any health problems at all as the result of the accident, they were of low severity at the outset, and improved over time. On July 30, 2019, Gerling purported to conduct an initial examination of VS at NY Orthopedics. Gerling did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gerling provided VS with substantially the same cervical and lumbar soft tissue injury "diagnosis" that he provided to virtually every other Insured, and referred VS to Spine Consult for a medically unnecessary anterior cervical disc fusion. NY Orthopedics and Gerling billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Gerling engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iv)     On April 5, 2019, an Insured named FM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed,

low-impact collision, and that FM's vehicle was drivable following the accident. The police report further indicated that FM was not injured and did not complain of any pain at the scene of the accident. In keeping with the fact that FM was not seriously injured, FM did not visit any hospital emergency room following the accident. To the extent that FM experienced any health problems at all as the result of the accident, they were of low severity. On August 2, 2019, Gerling purported to conduct an initial examination of FM at NY Orthopedics. Gerling did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gerling provided FM with substantially the same cervical and lumbar soft tissue injury "diagnosis" that he provided to virtually every other Insured, and referred FM to Spine Consult for a medically unnecessary anterior cervical disc fusion and transforaminal lumbar interbody fusion. NY Orthopedics and Gerling billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Gerling engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(v)     On October 28, 2021, an Insured named JG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JG's vehicle was drivable following the accident. The police report further indicated that JG was not injured and did not complain of any pain at the scene of the accident. In keeping with the fact that JG was not seriously injured, JG did not visit any hospital emergency room following the accident. To the extent that JG experienced any health problems at all as the result of the accident, they were of low severity. On August 2, 2019, Gerling purported to conduct an initial examination of JG at NY Orthopedics. Gerling did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gerling provided JG with substantially the same cervical and lumbar soft tissue injury "diagnosis" that he provided to virtually every other Insured, and referred JG to Gerling Institute for a medically unnecessary anterior cervical disc fusion. NY Orthopedics and Gerling billed GEICO for the initial examination using CPT code 99245, and thereby falsely represented that Gerling engaged in some legitimate, high complexity medical decision-making during the purported examination.

180.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

181.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

182.    As set forth above, virtually all of the Insureds whom NY Orthopedics, Gerling

Institute, Spine Health, Gerling, and Pyun purported to treat were involved in relatively minor accidents.

183.    It is extremely improbable that any two Insureds involved in any one of these minor automobile accidents would suffer substantially identical injuries as the result of their accidents or require a substantially identical course of treatment.

184.    It is even more improbable – to the point of impossibility – that this would occur repeatedly, often with the Insureds presenting at NY Orthopedics and Spine Health with substantially identical injuries on or about the exact same dates days, weeks, or even months after their accidents.

185.    Even so, and in keeping with the fact that NY Orthopedics, Gerling Institute, Spine Health, Gerling, and Pyun's putative "diagnoses" were phony, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, NY Orthopedics, Gerling Institute, Spine Health, Gerling, and Pyun frequently issued substantially identical, phony "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that they were differently situated.

186.    For example:

(i)    On July 15, 2017, two Insureds – YA and JB – were involved in the same automobile accident. More than six months later, YA and JB presented – incredibly – on the exact same date, February 9, 2018, to NY Orthopedics for initial examinations. YA and JB were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that YA and JB suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Gerling and NY Orthopedics provided YA and JB with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(ii)    On July 17, 2018, two Insureds – DW and MW – were involved in the same

automobile accident. Thereafter, DW and MW presented – incredibly – on the exact same date, October 15, 2018, to NY Orthopedics for initial examinations. DW and MW were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that DW and MW suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Gerling and NY Orthopedics provided DW and MW with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(iii)    On October 7, 2018, two Insureds – FA and CD – were involved in the same automobile accident. Thereafter, FA and CD presented – incredibly – on the exact same date, October 15, 2018, to NY Orthopedics for initial examinations. FA and CD were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that FA and CD suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Gerling, Pyun, and NY Orthopedics provided FA and CD with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(iv)    On April 30, 2019, two Insureds – RA and BC – were involved in the same automobile accident. On January 7, 2020, RA presented to NY Orthopedics for an initial examination. Then, three weeks later, on January 24, 2020, BC too presented to NY Orthopedics for an initial examination. RA and BC were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that RA and BC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Gerling and NY Orthopedics provided RA and BC with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(v)    On May 16, 2019, two Insureds – AH and ZH – were involved in the same automobile accident. More than one month later, AH and ZH presented – incredibly – on the exact same date, July 2, 2019, to NY Orthopedics for initial examinations. AH and ZH were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AH and ZH suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Gerling and NY Orthopedics provided AH and ZH with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(vi)    On September 20, 2019, two Insureds – CB and SB – were involved in the same automobile accident. More than two months later, CB and SB presented – incredibly – on the exact same date, December 6, 2019, to NY Orthopedics for

initial examinations. CB and SB were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that CB and SB suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Gerling and NY Orthopedics provided CB and SB with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(vii)     On December 20, 2020, two Insureds – CD and TO – were involved in the same automobile accident. More than two months later, CD and TO presented – incredibly – on the exact same date, March 2, 2021, to NY Orthopedics for initial examinations. , CD and TO were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that CD and TO suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Gerling and NY Orthopedics provided CD and TO with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(viii)    On June 24, 2021, two Insureds – JK and JR – were involved in the same automobile accident. Two months later, JK and JR presented – incredibly – on the exact same date, August 23, 2021, to NY Orthopedics for initial examinations. JK and JR were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that JK and JR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Gerling and NY Orthopedics provided JK and JR with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(ix)      On July 1, 2021, two Insureds – PP and DG – were involved in the same automobile accident. On August 5, 2021, PP presented to NY Orthopedics for an initial examination. Then, weeks later, on August 31, 2021, DG too presented to NY Orthopedics for an initial examination. PP and DG were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that PP and DG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Gerling and NY Orthopedics provided PP and DG with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(x)       On April 30, 2022, two Insureds – YT and SW – were involved in the same automobile accident. Four months later, YT and SW presented – incredibly – on the exact same date, July 2, 2019, to NY Orthopedics for initial examinations. YT and SW were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that YT and SW

suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Gerling and NY Orthopedics provided YT and SW with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

187.     These are only representative examples. In the claims for initial examinations that are identified in Exhibits "1" – "3", NY Orthopedics, Gerling Institute, Spine Health, Gerling, and Pyun frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that the Insureds were differently situated and, in any case, did not require the treatment.

188.     NY Orthopedics, Gerling Institute, Spine Health, Gerling, and Pyun routinely inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

189.     In the claims for initial examinations identified in Exhibits "1" – "3", NY Orthopedics, Gerling Institute, Spine Health, Gerling, and Pyun routinely falsely represented that the putative examinations involved medical decision making of low to moderate complexity in order to provide a false basis to bill for the initial examinations under CPT codes 99204, 99205, 99244, and 99245, because examinations billable under CPT codes 99204, 99205, 99244, and 99245 are reimbursable at a higher rate than examinations or examinations that do not require any complex medical decision-making at all.

**E.      The Fraudulent Charges for Follow-Up Examinations by NY Orthopedics, Gerling Institute, and Gerling**

190.      NY Orthopedics, Gerling Institute, Spine Health, Gerling, and Pyun also typically purported to subject the Insureds in the claims identified in Exhibits "1" – "3" to multiple fraudulent follow-up examinations during the course of the Defendants' fraudulent treatment and billing protocol.

191.      As set forth in Exhibits "1" – "3", Gerling and Pyun purported to perform the majority of the putative follow-up examinations on behalf of NY Orthopedics, Gerling Institute, and Spine Health, which Gerling, Pyun, NY Orthopedics, Gerling Institute, and Spine Health billed to GEICO using CPT codes 99213, 99214, 99215, typically resulting in a charge of between $64.07 and $568.48 for each purported follow-up examination.

192.      All of Gerling, Pyun, NY Orthopedics, Gerling Institute, and Spine Health's billing for their purported follow-up examinations was fraudulent because it misrepresented NY Orthopedics, Gerling Institute, and Spine Health's eligibility to collect PIP Benefits in the first instance.

193.      In fact, NY Orthopedics, Gerling Institute, and Spine Health never were eligible to collect PIP Benefits in the claims for follow-up examinations that are identified in Exhibits "1" – "3", because they engaged in unlawful and fraudulent conduct as described herein.

194.      Moreover, and as set forth below, Gerling, Pyun, NY Orthopedics, Gerling Institute, and Spine Health's charges for the putative follow-up examinations identified in Exhibits "1" – "3" were fraudulent in that they misrepresented the nature, extent, and results of the purported examinations.

**1.      Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

195.      For instance, in the claims for follow-up examinations that are identified in Exhibits

"1" – "3", Gerling, Pyun, NY Orthopedics, Gerling Institute, and Spine Health routinely misrepresented the severity of the Insureds' presenting problems.

196.     Pursuant to the CPT Assistant, the use of CPT codes 99214 or 99215 to bill for a follow-up examination typically requires that the patient present with problems of moderate to high severity.

197.     The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT codes 99214 or 99215 to bill for a follow-up patient examination.

198.     For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT codes 99214 or 99215 to bill for a follow-up patient examination:

(i)      Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)     Office evaluation of 28-year-old patient with regional enteritis, diarrhea and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii)    Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv)     Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v)      Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

(vi)     Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii)    Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology/General Surgery/ Internal Medicine/Family Medicine)

(viii)   Office visit with 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

199.   Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT codes 99214 or 99215 to bill for a follow-up patient examination typically are problems that pose a serious threat to a patient's health, or even the patient's life.

200.   By contrast, and as set forth above, to the extent that the Insureds in the claims identified in Exhibits "1" – "3" suffered any injuries at all in their relatively minor automobile accidents, the injuries virtually always were soft tissue injuries such as sprains and strains, which were of low or minimal severity at the outset and improved over time.

201.   By the time the Insureds in the claims identified in Exhibits "1" – "3" presented to NY Orthopedics, Gerling Institute, and/or Spine Health for the putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their relatively minor automobile accidents, or their presenting problems were minimal.

202.   Even so, in the claims for follow-up examinations identified in Exhibits "1" – "3", NY Orthopedics, Gerling Institute, Spine Health, Gerling, and Pyun routinely billed for their putative follow-up examinations under CPT codes 99214 or 99215, and thereby falsely represented that the Insureds continued to suffer from presenting problems of moderate to high severity, despite the fact that the purported examinations were provided many months after the Insureds' minor automobile accidents, and long after any soft tissue injury pain or other symptoms attendant to the minor automobile accidents would have resolved.

203.   For example:

(i)   On June 7, 2017, an Insured named PD was involved in an automobile accident. The contemporaneous police report indicated that PD's vehicle was drivable

following the accident. The police report further indicated that PD was not injured and did not complain of any pain at the scene of the accident. In keeping with the fact that PD was not seriously injured, PD did not visit any hospital emergency room following the accident. To the extent that PD experienced any health problems at all as the result of the accident, they were of low severity at the outset and improved over time. Even so, at the conclusion of a purported follow-up examination of PD on March 5, 2019 – nearly one year after the accident – Gerling, Pyun, and NY Orthopedics billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that the follow-up examination involved presenting problems of moderate to high severity.

(ii)    On September 23, 2017, an Insured named EM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EM's vehicle was drivable following the accident. The police report further indicated that EM was not injured in the accident and did not complain of any pain at the scene. In keeping with the fact that EM was not seriously injured, EM did not visit any hospital emergency room following the accident. To the extent that EM experienced any health problems at all as the result of the accident, they were of low severity at the outset and improved over time. Even so, at the conclusion of a purported follow-up examination of EM on September 4, 2018 – nearly one year after the accident – Gerling and NY Orthopedics billed GEICO for the follow-up examination using CPT code 99215 and thereby falsely represented that the follow-up examination involved presenting problems of moderate to high severity.

(iii)    On April 13, 2018, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that JR's vehicle was drivable following the accident. The police report further indicated that JR was not injured and did not complain of any pain at the scene of the accident. In keeping with the fact that JR was not seriously injured, JR did not visit any hospital emergency room following the accident. To the extent that JR experienced any health problems at all as the result of the accident, they were of low severity at the outset and improved over time. Even so, at the conclusion of a purported follow-up examination of JR on January 24, 2020 – more than a year and a half after the accident – Gerling and NY Orthopedics billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that the follow-up examination involved presenting problems of moderate to high severity.

(iv)    On May 31, 2018, an Insured named JP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JP's vehicle was drivable following the accident. The police report further indicated that JP was not injured in the accident and did not complain of any pain at the scene. In keeping with the fact that JP was not seriously injured in the accident, JP did not visit any hospital emergency room following the accident. To the extent that JP experienced any health problems at all following the

accident, they were of low severity at the outset and improved over time. Even so, at the conclusion of a purported follow-up examination of JP on October 29, 2019 – more than one year after the accident – Gerling and NY Orthopedics billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that the follow-up examination involved presenting problems of moderate to high severity.

(v)     On September 5, 2018, an Insured named OD was involved in an automobile accident. The contemporaneous police report indicated that OD's vehicle was drivable following the accident. The police report further indicated that OD was not injured and did not complain of any pain at the scene of the accident. In keeping with the fact that OD was not seriously injured, OD did not visit any hospital emergency room following the accident. To the extent that OD experienced any health problems at all as the result of the accident, they were of low severity at the outset and improved over time. Even so, at the conclusion of a purported follow-up examination of OD on August 27, 2019 – nearly one year after the accident – Gerling and NY Orthopedics billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that the follow-up examination involved presenting problems of moderate to high severity.

(vi)    On December 17, 2018, an Insured named VS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that VS's vehicle was drivable following the accident. The police report further indicated that VS was not injured and did not complain of any pain at the scene. Later that day, VS traveled on his own to Montefiore Hospital. The contemporaneous hospital records indicated that VS was briefly observed on an outpatient basis and was discharged that same day with a neck and back pain diagnosis. To the extent that VS experienced any health problems at all following the accident, they were of low severity at the outset and improved over time. Even so, at the conclusion of a purported follow-up examination of VS on April 5, 2022 – nearly three and a half years after the accident – Gerling and NY Orthopedics billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that the follow-up examination involved presenting problems of moderate to high severity.

(vii)   On March 23, 2019, an Insured named TR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that TR's vehicle was drivable following the accident. The policy report further indicated that TR was not injured and did not complain of any pain at the scene. Thereafter, TR traveled on his own to University Hospital of Brooklyn. The contemporaneous hospital records indicated that TR was briefly observed on an outpatient basis and discharged with a neck and back strain diagnosis. To the extent that TR experienced any health problems at all following the accident, they were of low severity at the outset and improved over time. Even so, at the conclusion of a purported follow-up examination of TR on July 9, 2021 – nearly two and a half years after the accident – Gerling, Pyun, and Spine Health billed

GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that the follow-up examination involved presenting problems of moderate to high severity.

(viii)   On August 4, 2019, an Insured named LK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that LK's vehicle was drivable following the accident. The police report further indicated that LK was not injured in the accident and did not complain of any pain at the scene. In keeping with the fact that LA was not seriously injured in the accident, LK did not visit any hospital emergency room following the accident. To the extent that LK experienced any health problems at all following the accident, they were of low severity at the outset and improved over time. Even so, at the conclusion of a purported follow-up examination of LK on March 31, 2021 – more than a year and a half after the accident – Gerling and Gerling Institute billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that the follow-up examination involved presenting problems of moderate to high severity.

(ix)   On November 4, 2020, an Insured named CL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that CL's vehicle was drivable following the accident. In keeping with the fact that CL was not seriously injured in the accident, CL did not visit any hospital emergency room following the accident. To the extent that CL experienced any health problems at all following the accident, they were of low severity at the outset and improved over time. Even so, at the conclusion of a purported follow-up examination of CL on May 4, 2021 – six months after the accident – Gerling and NY Orthopedics billed GEICO for the follow-up examination using CPT code 99215 and thereby falsely represented that the follow-up examination involved presenting problems of moderate to high severity.

(x)   On June 7, 2021, an Insured named AK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AK's vehicle was drivable following the accident. The police report further indicated that AK was not injured in the accident and did not complain of any pain at the scene. In keeping with the fact that AK was not seriously injured in the accident, AK did not visit any hospital emergency room following the accident. To the extent that AK experienced any health problems at all following the accident, they were of low severity at the outset and improved over time. Even so, at the conclusion of a purported follow-up examination of AK on December 7, 2021 – six months after the accident – Gerling and NY Orthopedics billed GEICO for the follow-up examination using CPT code 99215 and thereby falsely represented that the follow-up examination involved presenting problems of moderate to high severity.

204.   These are only representative examples. In virtually all of the claims for follow-up

examinations identified in Exhibits "1" – "3", NY Orthopedics, Gerling Institute, Spine Health, Gerling, and Pyun falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their relatively minor automobile accidents at the time of the follow-up examinations – which often were many months after the minor accidents – or else their presenting problems were minimal.

205.    In the claims for follow-up examinations identified in Exhibits "1" – "3", NY Orthopedics, Gerling Institute, Spine Health, Gerling, and Pyun routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for their charges for the putative examinations under CPT codes 99214 or 99215, because examinations billable under CPT codes 99214 and 99215 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

206.    In the claims for follow-up examinations identified in Exhibits "1" – "3", NY Orthopedics, Gerling Institute, Spine Health, Gerling, and Pyun also routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**2.      Misrepresentations Regarding the Results of the Follow-Up Examinations**

207.    Moreover, pursuant to the NY and NJ Fee Schedule, when NY Orthopedics, Gerling Institute, Spine Health, Gerling, and Pyun submitted charges for the follow-up examinations under CPT code 99214, they represented that they performed at least two of the following three components: (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

208.    Along similar lines, pursuant to the NY and NJ Fee Schedule, when NY

Orthopedics, Gerling Institute, Spine Health, Gerling, and Pyun submitted charges for the follow-up examinations under CPT code 99215, they represented that they performed at least two of the following three components:   (i) took a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "high complexity".

209.    In actuality, however, in the claims for follow-up examinations identified in in Exhibits "1" – "3", NY Orthopedics, Gerling Institute, Spine Health, Gerling, and Pyun did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

210.    Rather, following their purported follow-up examinations, NY Orthopedics, Gerling Institute, Spine Health, Gerling, and Pyun simply reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations and recommended that the Insureds undergo medically unwarranted surgical procedures such as laminotomies and anterior cervical disc fusions.

211.    In keeping with the fact that the putative "results" of the follow-up examinations were phony, NY Orthopedics, Gerling Institute, Spine Health, Gerling, and Pyun routinely falsely purported to diagnose continuing effects of soft tissue injuries in the Insureds long after the minor underlying automobile accidents occurred, and long after any attendant soft tissue injury pain or other symptoms attendant to the minor automobile accidents would have resolved.

212.    For example:

(i)      On June 7, 2017, an Insured named PD was involved in an automobile accident. The contemporaneous police report indicated that PD's vehicle was drivable following the accident. The police report further indicated that PD was not injured and did not complain of any pain at the scene of the accident. In keeping with the fact that PD was not seriously injured, PD did not visit any hospital emergency room following the accident. To the extent that PD experienced any health

problems at all as the result of the accident, they were of low severity at the outset and improved over time. Even so, at the conclusion of a purported follow-up examination of PD by Pyun on April 25, 2019 – underline nearly two years after the accident, and long after any legitimate symptoms PD may have experienced as the result of the accident had resolved – Pyun, Gerling, and NY Orthopedics falsely reported that PD continued to suffer from high levels of pain as the result of the accident, and recommended that PD undergo an anterior cervical diskectomy and fusion through NY Orthopedics.

(ii)    On September 23, 2017, an Insured named EM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EM's vehicle was drivable following the accident. The police report further indicated that EM was not injured in the accident and did not complain of any pain at the scene. In keeping with the fact that EM was not seriously injured, EM did not visit any hospital emergency room following the accident. To the extent that EM experienced any health problems at all as the result of the accident, they were of low severity at the outset and improved over time. Even so, at the conclusion of a purported follow-up examination by Pyun on September 4, 2018 – nearly one year after the accident – Pyun, Gerling, and NY Orthopedics falsely reported that EM continued to suffer from high levels of pain as the result of the accident, and recommended that EM undergo a laminectomy through Spine Consult.

(iii)   On September 5, 2018, an Insured named OD was involved in an automobile accident. The contemporaneous police report indicated that OD's vehicle was drivable following the accident. The police report further indicated that OD was not injured and did not complain of any pain at the scene of the accident. In keeping with the fact that OD was not seriously injured, OD did not visit any hospital emergency room following the accident. To the extent that OD experienced any health problems at all as the result of the accident, they were of low severity at the outset and improved over time. Even so, at the conclusion of a purported follow-up examination of OD by Pyun on March 5, 2019 – six months after the accident – Pyun, Gerling, and NY Orthopedics falsely reported that OD continued to suffer from high levels of pain as the result of the accident, and recommended that OD undergo an anterior cervical diskectomy and fusion through Spine Consult.

(iv)    On December 17, 2018, an Insured named VS was involved in an automobile accident. The contemporaneous police report indicated that VS's vehicle was drivable following the accident. The police report further indicated that VS was not injured and did not complain of any pain at the scene of the accident. Later that day, VS traveled on his own to Montefiore Hospital. The contemporaneous hospital records indicated that VS was briefly observed on an outpatient basis, and was discharged with a minor neck and back pain diagnosis. To the extent that VS experienced any health problems at all as the result of the accident, they were of low severity at the outset, and improved over time. Even so, at the conclusion of a purported follow-up examination of VS by Gerling on April 5, 2022 – underline more than

three years after the accident – Gerling and NY Orthopedics falsely reported that VS continued to suffer from high levels of pain as the result of the accident, and recommended that VS return for additional follow-up examinations.

(v)     On November 4, 2020, an Insured named CL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that CL's vehicle was drivable following the accident. In keeping with the fact that CL was not seriously injured in the accident, CL did not visit any hospital emergency room following the accident. To the extent that CL experienced any health problems at all following the accident, they were of low severity at the outset, and improved over time. Even so, at the conclusion of a purported follow-up examination of CL by Gerling on May 4, 2021 – six months after the accident - Gerling and NY Orthopedics falsely reported that CL continued to suffer from high levels of pain as the result of the accident, and recommended that CL undergo a lumbar diskectomy.

213.    These are only representative examples. In the claims for follow-up examinations identified in Exhibits "1" – "3", NY Orthopedics, Gerling Institute, Spine Health, Gerling, and Pyun routinely falsely represented that the Insureds continued to suffer from pain and other symptoms as the result of their relatively minor automobile accidents, often long after the minor accidents occurred.

214.    In the claims for follow-up examinations identified in in Exhibits "1" – "3", NY Orthopedics, Gerling Institute, Spine Health, Gerling, and Pyun routinely falsely represented that the Insureds continued to suffer pain and other symptoms as the result of minor soft tissue injuries, long after the underlying accidents occurred, because these phony diagnoses provided a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**G.     The Fraudulent Charges for Surgical Procedures**

215.    As set forth in Exhibits "1" – "4", pursuant to the Defendants' unlawful referral and patient brokering scheme, and based upon the phony, boilerplate "diagnoses" that NY Orthopedics, Gerling Institute, Spine Health, Gerling, and Pyun provided during their fraudulent examinations and follow-up examinations, NY Orthopedics, Gerling Institute, Spine Health, Spine Consult,

Gerling, and Pyun purported to subject many Insureds to a series of fraudulent and medically unnecessary surgical procedures, including anterior cervical disc fusions and laminotomies.

216.    As set forth in Exhibits "1" – "4", NY Orthopedics, Gerling Institute, Spine Health, Spine Consult, Gerling, and Pyun then billed the surgical procedures to GEICO under, among others: 20930, 20931, 20936, 20974, 22214, 22216, 22526, 22527, 22551, 22552, 22554, 22585, 22612, 22614, 22615, 22630, 22633, 22634, 22830, 22840, 22842, 22845, 22846, 22849, 22851, 22853, 22856, 22858, 22899, 29999, 63030, 63035, 63047, 63048, 63056, 63057, 63081, 63082, 64635, 64636, 64772, and 64999.

217.    Gerling and Pyun purported to personally perform the majority of the surgical procedures in the claims identified in Exhibits "1" – "4".

218.    Like the charges for the other Fraudulent Services, the charges for the surgical procedures identified in Exhibits "1" – "4" were fraudulent in that the surgical procedures were medically unnecessary, and were performed – to the extent that they were performed at all – pursuant to the Defendants' unlawful referral scheme, and the phony, boilerplate "diagnoses" that NY Orthopedics, Gerling Institute, Spine Health, Gerling, and Pyun provided during their fraudulent examinations and follow-up examinations.

219.    Moreover, in the claims for surgical procedures identified in Exhibits "1" – "4", the charges for the surgical procedures were fraudulent in that they misrepresented NY Orthopedics, Gerling Institute, Spine Health, Gerling, and Pyun's eligibility to collect PIP Benefits in the first instance.

220.    As set forth above NY Orthopedics, Gerling Institute, Spine Health, Gerling, and Pyun never were eligible to collect PIP Benefits in connection with the claims identified in Exhibits "1" – "4", because – as a result of the fraudulent scheme described herein – neither they nor the

surgical procedures were in compliance with all significant laws and regulations governing health care practice and/or licensing laws in New Jersey and New York.

1. **The Defendants' Unlawful Self-Referrals**

221.    In the context of the Codey Law, Gerling – as a licensed physician – was a "practitioner". See N.J.S.A. 45:9-22.4.

222.    In the context of the Codey Law, NY Orthopedics, Gerling Institute, Spine Health, and Spine Consult were "health care service[s]" in that they were "business entit[ies] which provide[d] on an inpatient or outpatient basis: … diagnosis or treatment of human disease or dysfunction … ." Id.

223.    In the context of the Codey Law, Pyun, Jessica Amoona, P.A. ("Amoona"), and Agatha Koch, N.P. ("Koch") were Gerling's employees at NY Orthopedics, Gerling Institute, Spine Health, and Spine Consult.

224.    In the context of the Codey Law, Gerling – who owned NY Orthopedics, Gerling Institute, Spine Health, and Spine Consult – had a "significant beneficial interest" in NY Orthopedics, Gerling Institute, Spine Health, and Spine Consult.

225.    In the context of the Codey Law, surgical procedures performed in a hospital setting on an inpatient basis do not qualify as "ambulatory surgery or procedures requiring anesthesia performed at … an ambulatory care facility licensed by the Department of Health to perform surgical and related services".

226.    In many of the claims for surgical procedures identified in Exhibits "1" – 4", Gerling, Pyun, Amoona, or Koch would examine the Insured at one of NY Orthopedics, Gerling Institute, Spine Health, or Spine Consult's treatment locations, and then Gerling would cause the Insured to be self-referred to NY Orthopedics, Gerling Institute, Spine Health, or Spine Consult

for the pertinent surgeries, many of which were performed on an inpatient basis at Hudson Regional Hospital, not at Gerling, NY Orthopedics, Gerling Institute, Spine Health, or Spine Consult's medical offices. Those procedures were then billed to GEICO, often resulting in charges of hundreds of thousands of dollars.

227. For example:

(i) On or about October 26, 2018, Gerling self-referred an Insured named CL from NY Orthopedics to Spine Consult for a series of surgical procedures. The surgical procedures were performed by Gerling and Pyun on November 28, 2018 at Hudson Regional Hospital, rather than at Gerling or NY Orthopedics' medical office, on an inpatient basis, and therefore violated the Codey Law. Even so, Gerling, Pyun, and Spine Consult billed GEICO $569,965.51 for the surgical procedures, which were the product of an unlawful self-referral.

(ii) On or about January 30, 2019, Pyun – at Gerling's direction – self-rferred an Insured named LR from NY Orthopedics to Spine Consult for a series of spinal surgical procedures. The surgical procedures were performed by Gerling and Pyun on April 10, 2019 at Hudson Regional Hospital, rather than at Gerling or NY Orthopedics' medical office, on an inpatient basis, and therefore violated the Codey Law. Even so, Gerling, Pyun, and Spine Consult billed GEICO $480,464.51 for the surgical procedures, which were the product of an unlawful self-referral.

(iii) On or about March 4, 2019, Gerling self-referred an Insured named SB from NY Orthopedics to Spine Consult for a series of spinal surgical procedures. The surgical procedures were performed by Gerling and Pyun on April 10, 2019 at Hudson Regional Hospital, rather than at Gerling or NY Orthopedics' medical office, on an inpatient basis, and therefore violated the Codey Law. Even so, Gerling, Pyun, and Spine Consult billed GEICO $418,181.52 for the surgical procedures, which were the product of an unlawful self-referral.

(iv) On or about March 5, 2019, Gerling self-referred an Insured named OD from NY Orthopedics to Spine Consult for a series of spinal surgical procedures. The surgical procedures were performed by Gerling on April 10, 2019 at Hudson Regional Hospital, rather than at Gerling or Gerling Institute's medical office, on an inpatient basis, and therefore violated the Codey Law. Even so, Gerling, Pyun, and Spine Consult billed GEICO $480,464.51 for the surgical procedures, which were the product of an unlawful self-referral.

(v) On or about January 7, 2020, Gerling self-referred an Insured named RA from NY Orthopedics to Spine Consult for a series of spinal surgical procedures. The surgical procedures were performed by Gerling and Koch on February 26, 2020 at Hudson Regional Hospital, rather than at Gerling or NY Orthopedics' medical office, on an

inpatient basis, and therefore violated the Codey Law. Even so, Gerling and Spine Consult billed GEICO $595,456.51 for the surgical procedures, which were the product of an unlawful self-referral.

(vi)     On or about June 11, 2020, Gerling self-referred an Insured named NC from NY Orthopedics to Gerling Institute for a series of spinal surgical procedures. The surgical procedures were performed by Gerling and Pyun on July 22, 2020 at Hudson Regional Hospital, rather than at Gerling or NY Orthopedics' medical office, on an inpatient basis, and therefore violated the Codey Law. Even so, Gerling, Pyun, and Gerling Institute billed GEICO $551,118.67 for the surgical procedures, which were the product of an unlawful self-referral.

(vii)    On or about July 14, 2020, Gerling self-referred an Insured named SB from NY Orthopedics to Gerling Institute for a series of spinal surgical procedures. The surgical procedures were performed by Gerling and Pyun on August 12, 2020 at Hudson Regional Hospital, rather than at Gerling or NY Orthopedics' medical office, on an inpatient basis, and therefore violated the Codey Law. Even so, Gerling, Pyun, and Gerling Institute billed GEICO $593,977.10 for the surgical procedures, which were the product of an unlawful self-referral.

(viii)   On or about November 12, 2020, Gerling self-referred an Insured named JG from NY Orthopedics to Gerling Institute for a series of spinal surgical procedures. The surgical procedures were performed by Gerling and Pyun on December 9, 2020 at Hudson Regional Hospital, rather than at Gerling or NY Orthopedics' medical office, on an inpatient basis, and therefore violated the Codey Law. Even so, Gerling, Pyun, and Gerling Institute billed GEICO $720,317.43 for the surgical procedures, which were the product of an unlawful self-referral.

(ix)     On or about April 21, 2021, Gerling self-referred an Insured named MS to Gerling Institute for a series of spinal surgical procedures. The surgical procedures were performed by Gerling on June 9, 2021 at Hudson Regional Hospital, rather than at Gerling or Gerling Institute's medical office, on an inpatient basis, and therefore violated the Codey Law. Even so, Gerling and Gerling Institute billed GEICO $542,250.99 for the surgical procedures, which were the product of an unlawful self-referral.

(x)      On or about December 3, 2019, Gerling self-referred an Insured named JP from NY Orthopedics to Spine Consult for a series of spinal surgical procedures. The surgical procedures were performed by Gerling on March 11, 2020 at Hudson Regional Hospital, rather than at Gerling or NY Orthopedics' medical office, on an inpatient basis, and therefore violated the Codey Law. Even so, Gerling and Spine Consult billed GEICO $332,312.81 for the surgical procedures, which were the product of an unlawful self-referral.

(xi)     On or about July 20, 2021, Koch – at Gerling's direction – self-referred an Insured named EP from Spine Health to Gerling Institute for a series of spinal surgical

procedures. The surgical procedures were performed by Gerling on August 11, 2021 at Hudson Regional Hospital, rather than at Gerling or Gerling Institute's medical office, on an inpatient basis, and therefore violated the Codey Law. Even so, Gerling and Gerling Institute billed GEICO $906,140.08 for the surgical procedures, which were the product of an unlawful self-referral.

(xii)    On or about September 10, 2021, Gerling self-referred an Insured named AS from NY Orthopedics to Gerling Institute for a series of spinal surgical procedures. The surgical procedures were performed by Gerling and Pyun December 22, 2021 at Hudson Regional Hospital, rather than at Gerling or NY Orthopedics' medical office, on an inpatient basis, and therefore violated the Codey Law. Even so, Gerling, Pyun, and Gerling Institute billed GEICO $542,014.49 for the surgical procedures, which were the product of an unlawful self-referral.

(xiii)    On or about November 3, 2021, Gerling self-referred an Insured named LR to Gerling Institute for a series of spinal surgical procedures. The surgical procedures were performed by Gerling and Pyun on February 9, 2022 at Hudson Regional Hospital, rather than at Gerling or Gerling Institute's medical office, on an inpatient basis, and therefore violated the Codey Law. Even so, Gerling, Pyun, and Gerling Institute billed GEICO $667,309.47 for the surgical procedures, which were the product of an unlawful self-referral.

(xiv)    On or about January 18, 2022, Gerling self-referred an Insured named JG from NY Orthopedics to Gerling Institute for a series of spinal surgical procedures. The surgical procedures were performed by Gerling and Pyun on July 22, 2020 at Hudson Regional Hospital, rather than at Gerling or NY Orthopedics' medical office, on an inpatient basis, and therefore violated the Codey Law. Even so, Gerling, Pyun, and Gerling Institute billed GEICO $452,600.73 for the surgical procedures, which were the product of an unlawful self-referral.

(xv)    On or about May 4, 2022, Gerling self-referred an Insured named JB to Gerling Institute for a series of spinal surgical procedures. The surgical procedures were performed by Gerling on May 25, 2022 at Hudson Regional Hospital, rather than at Gerling or Gerling Institute's medical office, on an inpatient basis, and therefore violated the Codey Law. Even so, Gerling, Pyun, and Spine Consult billed GEICO $789,112.98 for the surgical procedures, which were the product of an unlawful self-referral.

228.    These are only representative examples. In the claims for surgical procedures identified in Exhibits "2" and 4", Gerling – or Pyun, Amoona, or Koch at Gerling's direction – routinely would unlawfully self-refer Insureds to Gerling Institute or Spine Consult for surgical procedures that were provided, to the extent they were legitimately provided at all, at Hudson

Regional Hospital, not at Gerling, NY Orthopedics, Gerling Institute, Spine Health, or Spine Consult's medical offices.

**2.      The Defendants' Charges for Medically Unnecessary Surgeries**

229.    As set forth above, as part of their fraudulent scheme, NY Orthopedics, Gerling Institute, Spine Health, Spine Consult, Gerling, and Pyun purported to subject many Insureds to a series of fraudulent and medically unnecessary surgical procedures, including anterior cervical disc fusions and laminotomies

230.    By the time NY Orthopedics, Gerling Institute, Spine Health, Spine Consult, Gerling, and Pyun purported to provide the surgical procedures, the Insureds had either no presenting problems at all, or their presenting problems consisted of minor sprains and strains that were in the process of being resolved through conservative treatment, or without any treatment at all.

231.    Even so, in the claims for surgical procedures identified in Exhibits "1" – "4", NY Orthopedics, Gerling Institute, Spine Health, Spine Consult, Gerling, and Pyun routinely purported to provide surgical procedures to Insureds who did not have any serious symptoms secondary to any automobile accident that legitimately would warrant the procedures.

232.    For example:

(i)      On June 7, 2017, an Insured named PD was involved in an automobile accident. The contemporaneous police report indicated that PD's vehicle was drivable following the accident. The police report further indicated that PD was not injured and did not complain of any pain at the scene of the accident. In keeping with the fact that PD was not seriously injured, PD did not visit any hospital emergency room following the accident. To the extent that PD experienced any health problems at all as the result of the accident, they were of low severity at the outset and improved over time. Even so, on April 25, 2019 – <u>nearly two years</u> after the accident, and long after any legitimate symptoms PD may have experienced as the result of the accident had resolved – Gerling, Pyun, and Spine Consult purported to provide PD with an anterior cervical diskectomy and fusion, despite the fact that PD had not suffered any serious injury as the result of the relatively minor accident.

Gerling, Pyun, and Spine Consult then billed GEICO more than $25,000.00 for the procedures, which were medically unnecessary.

(ii)     On October 6, 2017, an Insured named SM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that SM's vehicle was drivable following the accident. Following the accident, SM was transported to St. Barnabas Hospital. The contemporaneous hospital records indicated that SM was briefly observed on an outpatient basis, and was discharged that same day with a shoulder pain diagnosis. To the extent that SM experienced any health problems at all as the result of the accident, they were of low severity. Even so, on May 24, 2018, Gerling, Pyun, and NY Orthopedics purported to provide SM with, among other things, a transforaminal fusion and a laminectomy, despite the fact that SM had not suffered any serious injury as the result of the accident. Gerling, Pyun, and NY Orthopedics then billed GEICO more than $25,000.00 for the procedures, which were medically unnecessary.

(iii)    On April 13, 2018, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that JR's vehicle was drivable following the accident. The police report further indicated that JR was not injured and did not complain of any pain at the scene of the accident. In keeping with the fact that JR was not seriously injured, JR did not visit any hospital emergency room following the accident. To the extent that JR experienced any health problems at all as the result of the accident, they were of low severity at the outset and improved over time. Even so, on March 1, 2019 – more than 10 months after the accident, and long after any legitimate symptoms JR may have experienced as the result of the accident had resolved – Gerling and Spine Consult purported to provide JR with a lumbar discectomy, despite the fact that JR had not suffered any serious injury as the result of the relatively minor accident. Gerling and Spine Consult then billed GEICO more than $150,000.00 for the procedures, which were medically unnecessary.

(iv)    On July 26, 2018, an Insured named SC was involved in an automobile accident. The contemporaneous police report indicated that SC's vehicle was drivable following the accident. The police report further indicated that SC was not injured and did not complain of any pain at the scene of the accident. In keeping with the fact that SC was not seriously injured, SC did not visit any hospital emergency room following the accident. To the extent that SC experienced any health problems at all as the result of the accident, they were of low severity. Even so, on March 13, 2019, Gerling and Spine Consult purported to provide SC with, among other things, a lumbar discectomy, despite the fact that SC had not suffered any serious injury as the result of the relatively minor accident. Gerling and Spine Consult then billed GEICO more than $200,000.00 for the procedures, which were medically unnecessary.

(v)     On September 5, 2018, an Insured named OD was involved in an automobile accident. The contemporaneous police report indicated that OD's vehicle was

drivable following the accident. The police report further indicated that OD was not injured and did not complain of any pain at the scene of the accident. In keeping with the fact that OD was not seriously injured, OD did not visit any hospital emergency room following the accident. To the extent that OD experienced any health problems at all as the result of the accident, they were of low severity. Even so, on April 10, 2019, Gerling, Pyun, and Spine Consult purported to provide OD with an anterior cervical diskectomy and fusion, despite the fact that OD had not suffered any serious injury as the result of the relatively minor accident. Gerling, Pyun, and Spine Consult then billed GEICO more than $450,000.00 for the procedures, which were medically unnecessary.

(vi)     On October 30, 2018, an Insured named JS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JS's vehicle was drivable following the accident. The police report further indicated that JS was not injured and did not complain of any pain at the scene of the accident. In keeping with the fact that JS was not seriously injured, JS did not visit any hospital emergency room following the accident. To the extent that JS experienced any health problems at all as the result of the accident, they were of low severity. Even so, on February 27, 2019, Gerling, Pyun, and Spine Consult purported to provide JS with a transforaminal fusion and a laminectomy, despite the fact that JS had not suffered any serious injury as the result of the relatively minor accident. Gerling, Pyun, and Spine Consult then billed GEICO more than $600,000.00 for the procedures, which were medically unnecessary.

(vii)    On December 17, 2018, an Insured named VS was involved in an automobile accident. The contemporaneous police report indicated that VS's vehicle was drivable following the accident. The police report further indicated that VS was not injured and did not complain of any pain at the scene of the accident. Later that day, VS traveled on his own to Montefiore Hospital. The contemporaneous hospital records indicated that VS was briefly observed on an outpatient basis, and was discharged with a minor neck and back pain diagnosis. To the extent that VS experienced any health problems at all as the result of the accident, they were of low severity at the outset, and improved over time. Even so, on October 18, 2019 – 10 months after the accident, and long after any legitimate symptoms VS may have experienced as the result of the accident had resolved – Gerling, Pyun, and Spine Consult purported to provide VS with an anterior cervical diskectomy and fusion, despite the fact that VS had not suffered any serious injury as the result of the relatively minor accident. Gerling, Pyun, and Spine Consult then billed GEICO more than $450,000.00 for the procedures, which were medically unnecessary.

(viii)   On April 5, 2019, an Insured named FM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that FM's vehicle was drivable following the accident. The police report further indicated that FM was not injured and did not complain of any pain at the scene of the accident. In keeping with the fact that FM was not seriously injured, FM did not visit any hospital emergency room following the

accident. To the extent that FM experienced any health problems at all as the result of the accident, they were of low severity. Even so, on August 14, 2019, Gerling, Pyun, and Spine Consult purported to provide FM with an anterior cervical diskectomy and fusion, despite the fact that FM had not suffered any serious injury as the result of the relatively minor accident. Gerling, Pyun, and Spine Consult then billed GEICO more than $750,000.00 for the procedures, which were medically unnecessary.

(ix)     On June 2, 2020, an Insured named MG was involved in an automobile accident. The contemporaneous police report indicated that MG was not injured and did not complain of any pain at the scene of the accident. In keeping with the fact that MG was not seriously injured, MG did not visit any hospital emergency room following the accident. To the extent that MG experienced any health problems at all as the result of the accident, they were of low severity. Even so, on October 14, 2020, Gerling and Gerling Institute purported to provide MG with a lumbar discectomy, despite the fact that MG had not suffered any serious injury as the result of the accident. Gerling and Gerling Institute then billed GEICO more than $200,000.00 for the procedures, which were medically unnecessary.

(x)     On October 28, 2021, an Insured named JG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JG's vehicle was drivable following the accident. The police report further indicated that JG was not injured and did not complain of any pain at the scene of the accident. In keeping with the fact that JG was not seriously injured, JG did not visit any hospital emergency room following the accident. To the extent that JG experienced any health problems at all as the result of the accident, they were of low severity. Even so, on February 23, 2022, Gerling, Pyun, and Gerling Institute JG with an anterior cervical diskectomy and fusion, despite the fact that JG had not suffered any serious injury as the result of the relatively minor accident. Gerling, Pyun, and Gerling Institute then billed GEICO more than $450,000.00 for the procedures, which were medically unnecessary.

233.     These are only representative examples. In the claims for surgical procedures identified in Exhibits "1" – "4", NY Orthopedics, Gerling Institute, Spine Health, Spine Consult, Gerling, and Pyun routinely falsely represented that the procedures were medically necessary, when in fact they were not.

234.     In a legitimate clinical setting, invasive and expensive procedures such as discectomies, laminotomies, and disc fusions should be provided only once a patient has tried and

failed a course of more conservative care, including physical therapy, pain medications, and interventional pain management services.

235.    Gerling knew that, in order to falsely represent that his surgical procedures were medically necessary, he needed to create the appearance that Insureds had tried and failed a course of more conservative care prior to undergoing surgery.

236.    However, Gerling also knew that, if he waited for Insureds to try and fail courses of expensive interventional pain management services, the Insureds' no-fault insurance benefits were at risk of being exhausted before Gerling ever had the chance to perform and bill for the surgical procedures.

237.    Therefore, Gerling, NY Orthopedics, Gerling Institute, Spine Health, Spine Consult, and Gerling often simply went ahead with a spinal surgical procedure without the Insured ever trying a course of more conservative pain management services. In those instances, Gerling Institute, Spine Health, Spine Consult, Gerling simply fabricated their surgical reports to falsely represent that the Insureds had undergone a trial of pain management services, when in fact they had not.

238.    For example:

(i)     On October 1, 2018, Gerling, Pyun, and NY Orthopedics purported to provide an Insured named NA with a transforaminal lumbar interbody fusion. In their surgical report, Gerling, Pyun, and NY Orthopedics falsely represented that NA had failed a course of "interventional pain management" prior to the surgery when, in fact, NA had not failed a course of interventional pain management prior to the surgery.

(ii)    On September 14, 2020, Gerling, Pyun, NY Orthopedics, and Spine Health purported to provide an Insured named GA with an anterior cervical diskectomy and fusion. In their surgical report, Gerling Pyun, and Gerling Institute falsely represented that GA had failed "pain management trials" prior to the surgery when, in fact, GA had not failed pain management trials prior to the surgery.

(iii)   On February 8, 2021, Gerling and NY Orthopedics purported to provide an Insured named DB with an anterior cervical diskectomy and fusion. In their surgical report,

Gerling and NY Orthopedics falsely represented that DB had failed "pain management trials" prior to the surgery when, in fact, DB had not failed pain management trials prior to the surgery.

(iv)     On February 23, 2022, Gerling, Pyun, and Gerling Institute purported to provide an Insured named JG with an anterior cervical diskectomy and fusion. In their surgical report, Gerling Pyun, and Gerling Institute falsely represented that JG had failed "pain management trials" prior to the surgery when, in fact, JG had not failed pain management trials prior to the surgery.

(v)      On May 25, 2022, Gerling and Gerling Institute purported to provide an Insured named JB with a lumbar discectomy. In their surgical report, Gerling and Gerling Institute falsely represented that JB had failed "pain management trials" prior to the surgery when, in fact, JB had not failed pain management trials prior to the surgery.

239.     These are only representative examples. In the claims for surgical procedures identified in Exhibits "1" – "4", NY Orthopedics, Gerling Institute, Spine Health, Spine Consult, Gerling, and Pyun routinely falsely represented that the Insureds to whom they provided surgical procedures had failed a course of pain management services, when in fact they had not.

## III.   The Fraudulent Billing Submitted to GEICO

240.     To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of bills and treatment reports through NY Orthopedics, Gerling Institute, Spine Health, and Spine Consult, containing thousands of fraudulent charges, seeking payment for the Fraudulent Services for which they were not entitled to receive payment.

241.     The bills and treatment reports were false and misleading in the following material respects:

(i)      The bills and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants were in compliance with all significant statutory and regulatory requirements governing health care practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, the Defendants were not in compliance with all significant statutory and regulatory requirements governing health care practice in New York and New Jersey and/or licensing laws, and therefore were not eligible to receive PIP reimbursement because, among other things: (a) the Defendants were engaged in an unlawful patient brokering scheme and paid and received unlawful

70

compensation in exchange for patient referrals; (b) the Defendants engaged in an unlawful self-referral scheme; (c) the Defendants purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; (d) the Defendants inflated, exaggerated, and misrepresented the nature and extent of the Fraudulent Services in their billing to GEICO; (e) NY Orthopedics unlawfully operated in New Jersey as a foreign professional corporation; and (f) Gerling Institute unlawfully operated in New York as a foreign professional corporation.

(ii)     The bills and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all significant statutory and regulatory requirements governing health care practice in New York and New Jersey and/or licensing laws, and therefore were eligible for PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all significant statutory and regulatory requirements governing health care practice in New York and New Jersey and/or licensing laws, and therefore were not eligible for PIP reimbursement, because, among other things: (a) the Fraudulent Services were provided pursuant to an unlawful patient brokering, referral, and self-referral scheme; and (b) the Fraudulent Services were medically unnecessary and, in many cases, illusory.

(iii)    The bills and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed in the first instance. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre–determined fraudulent treatment, referral, and billing protocol designed to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to it.

(iv)     The bills and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

## IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

242.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

243.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

244.    For instance, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a fraudulent, pre–determined protocol designed to maximize the charges that could be submitted, not to benefit the Insureds who supposedly were subjected to it.

245.    Likewise, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services frequently were never performed in the first instance.

246.    In addition, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were performed, to the extent that they are performed at all, pursuant to an illegal referral scheme.

247.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time–consuming arbitrations against GEICO and other insurers if the charges were not promptly paid in full.

248.    GEICO is under statutory and contractual obligations to promptly and fairly process claims. The facially–valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and omissions described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $2,200,000.00.

249.    Based upon the Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against NY Orthopedics, Gerling Institute, Spine Health, and Spine Consult**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

250.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 249 above.

251.    There is an actual case in controversy between GEICO and NY Orthopedics, Gerling Institute, Spine Health, and Spine Consult regarding more than $75,000.00 in unpaid billing for the Fraudulent Services that has been submitted to GEICO through NY Orthopedics, Gerling Institute, Spine Health, and Spine Consult.

252.    NY Orthopedics, Gerling Institute, Spine Health, and Spine Consult have no right to receive payment for any pending bills submitted to GEICO because of the fraudulent and unlawful activities described herein.

253.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that NY Orthopedics, Gerling Institute, Spine Health, and Spine Consult have no right to receive payment for any pending bills submitted to GEICO.

**SECOND CAUSE OF ACTION**
**Against Gerling**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

254.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 249 above.

255.    NY Orthopedics is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

256.    Gerling knowingly conducted and/or participated, directly or indirectly, in the conduct of NY Orthopedics' affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that NY Orthopedics was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the Defendants were engaged in an unlawful patient brokering, referral, and self-referral scheme; (iv) the billed-for services, in many cases, were not legitimately performed at all; (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (vi) NY Orthopedics unlawfully operated in New Jersey as a foreign professional corporation; and (vii) neither NY Orthopedics nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

257.    NY Orthopedics' business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Gerling has operated NY Orthopedics, inasmuch as NY Orthopedics is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for NY Orthopedics to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the

fact that Gerling continues to submit fraudulent billing to GEICO, and continues to attempt collection on the fraudulent billing submitted through NY Orthopedics to the present day.

258.    NY Orthopedics is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by NY Orthopedics in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

259.    GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $400,000.00 pursuant to the fraudulent bills submitted through NY Orthopedics.

260.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION
### Against Gerling, Pyun, Dovman, Gran, and Campiro
### (Violation of RICO, 18 U.S.C. § 1962(d))

261.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 249 above.

262.    NY Orthopedics is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

263.    Gerling, Pyun, Dovman, Gran, and Campiro are employed by and/or associated with the NY Orthopedics enterprise.

264.    Gerling, Pyun, Dovman, Gran, and Campiro knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the NY Orthopedics enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of

the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than five years seeking payments that NY Orthopedics was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the Defendants were engaged in an unlawful patient brokering, referral, and self-referral scheme; (iv) the billed-for services, in many cases, were not legitimately performed at all; (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (vi) NY Orthopedics unlawfully operated in New Jersey as a foreign professional corporation; and (vii) neither NY Orthopedics nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

265.   Gerling, Pyun, Dovman, Gran, and Campiro knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

266.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $400,000.00 pursuant to the fraudulent bills submitted through NY Orthopedics.

267.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

<div align="center">

**FOURTH CAUSE OF ACTION**
**Against NY Orthopedics and Gerling**
**(Common Law Fraud)**

</div>

268.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 249 above.

269.    NY Orthopedics and Gerling intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

270.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "2" the representation that NY Orthopedics and Gerling were in compliance with all significant laws and regulations governing health care practice, when in fact they were not; (ii) in every claim identified in Exhibit "2", the representation that NY Orthopedics and Gerling were eligible to receive reimbursement, when in fact they were not; (iii) in every claim identified in Exhibit "1", concealment of the Defendants' illegal kickback and referral scheme; (iv) in every claim identified in Exhibit "1", the representation that the Fraudulent Services were medically necessary, and in some cases actually performed, when in fact the Fraudulent Services were not medically necessary, in some cases were not performed at all, and were performed – to the extent that they were performed at all – as part of a pre-determined fraudulent treatment and billing protocol designed to financially enrich NY

<div align="center">77</div>

Orthopedics and Gerling, not to benefit the Insureds who supposedly were subjected to them; and (v) in every claim identified in Exhibit "1", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing health care practice, and were eligible for reimbursement, when in fact they were not.

271.    NY Orthopedics and Gerling intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through NY Orthopedics that were not compensable.

272.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $400,000.00 pursuant to the fraudulent bills submitted by the Defendants through NY Orthopedics.

273.    NY Orthopedics and Gerling's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages

274.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Pyun, Dovman, Gran, and Campiro**
**(Aiding and Abetting Fraud)**

275.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 249 above.

276.    Pyun, Dovman, Gran, and Campiro knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by NY Orthopedics and Gerling.

277.    The acts of Pyun, Dovman, Gran, and Campiro in furtherance of the fraudulent scheme involve brokering patients to NY Orthopedics and Gerling for medically unnecessary services, providing incentivizing compensation to NY Orthopedics and Gerling to perform unnecessary services, providing compensation to patients to incentivize those patients to undergo surgical procedures through NY Orthopedics and Gerling, and performing unnecessary services on behalf of NY Orthopedics and Gerling.

278.    The conduct of Pyun, Dovman, Gran, and Campiro was significant and material. The conduct of Pyun, Dovman, Gran, and Campiro was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for NY Orthopedics and Gerling to obtain payment from GEICO and from other insurers.

279.    Pyun, Dovman, Gran, and Campiro aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to NY Orthopedics for non-reimbursable and medically unnecessary Fraudulent Services, because they sought to continue profiting through the fraudulent scheme.

280.    The conduct of Pyun, Dovman, Gran, and Campiro caused GEICO to pay more than $400,000.00 pursuant to the fraudulent bills submitted or caused to be submitted through NY Orthopedics.

281.    Pyun, Dovman, Gran, and Campiro's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

282.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SIXTH CAUSE OF ACTION
### Against NY Orthopedics and Gerling
### (Unjust Enrichment)

283.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 249 above.

284.    As set forth above, NY Orthopedics and Gerling have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

285.    When GEICO paid the bills and charges submitted or caused to be submitted by NY Orthopedics and Gerling through NY Orthopedics for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

286.    NY Orthopedics and Gerling have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

287.    NY Orthopedics and Gerling's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

288.    By reason of the above, NY Orthopedics and Gerling have been unjustly enriched in an amount to be determined at trial, but in no event less than $400,000.00.

## SEVENTH CAUSE OF ACTION
### Against Gerling
### (Violation of RICO, 18 U.S.C. § 1962(c))

289.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 249 above.

290.    Gerling Institute is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

291.    Gerling knowingly conducted and/or participated, directly or indirectly, in the conduct of Gerling Institute's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over four years seeking payments that Gerling Institute was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the Defendants were engaged in an unlawful referral and self-referral scheme; (iv) the billed-for services, in many cases, were not legitimately performed at all; (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (vi) Gerling Institute unlawfully operated in New York as a foreign professional corporation; and (vii) neither Gerling Institute nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

292.    Gerling Institute's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Gerling has operated Gerling Institute, inasmuch as Gerling Institute is not engaged in a legitimate chiropractic practice, and acts of mail fraud therefore are essential in order for Gerling Institute to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does

the fact that Gerling continues to submit fraudulent billing to GEICO, and continues to attempt collection on the fraudulent billing submitted through Gerling Institute to the present day.

293. Gerling Institute is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Gerling Institute in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

294. GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $1,000,000.00 pursuant to the fraudulent bills submitted through Gerling Institute.

295. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
### Against Gerling, NY Orthopedics, Spine Health, and Pyun
### (Violation of RICO, 18 U.S.C. § 1962(d))

296. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 249 above.

297. Gerling Institute is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

298. Gerling, NY Orthopedics, Spine Health, and Pyun are employed by and/or associated with the Gerling Institute enterprise.

299. Gerling, NY Orthopedics, Spine Health, and Pyun knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Gerling Institute enterprise's affairs, through a pattern of racketeering activity consisting of

repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than four years seeking payments that Gerling Institute was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the Defendants were engaged in an unlawful referral and self-referral scheme; (iv) the billed-for services, in many cases, were not legitimately performed at all; (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (vi) Gerling Institute unlawfully operated in New York as a foreign professional corporation; and (vii) neither Gerling Institute nor the underlying services were in compliance with applicable law.  The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

300.    Gerling, NY Orthopedics, Spine Health, and Pyun knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

301.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,000,000.00 pursuant to the fraudulent bills submitted through Gerling Institute.

302.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**NINTH CAUSE OF ACTION**
**Against Gerling Institute and Gerling**
**(Common Law Fraud)**

303.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 249 above.

304.     Gerling Institute and Gerling intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

305.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "2" the representation that Gerling Institute and Gerling were in compliance with all significant laws and regulations governing health care practice, when in fact they were not; (ii) in every claim identified in Exhibit "1", the representation that Gerling Institute and Gerling were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "2", concealment of the Defendants' illegal kickback and referral scheme; (iv) in every claim identified in Exhibit "2", the representation that the Fraudulent Services were medically necessary, and in some cases actually performed, when in fact the Fraudulent Services were not medically necessary, in some cases were not performed at

all, and were performed – to the extent that they were performed at all – as part of a pre-determined fraudulent treatment and billing protocol designed to financially enrich Gerling Institute and Gerling, not to benefit the Insureds who supposedly were subjected to them; and (v) in every claim identified in Exhibit "2", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing health care practice, and were eligible for PIP reimbursement, when in fact they were not.

306.    Gerling Institute and Gerling intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Gerling Institute that were not compensable.

307.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $1,000,000.00 pursuant to the fraudulent bills submitted by the Defendants through Gerling Institute.

308.    Gerling Institute and Gerling's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages

309.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

<div align="center">

**TENTH CAUSE OF ACTION**
**Against NY Orthopedics, Spine Health, and Pyun**
**(Aiding and Abetting Fraud)**

</div>

310.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 249 above.

311.    NY Orthopedics, Spine Health, and Pyun knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Gerling Institute and Gerling.

312.    The acts of NY Orthopedics, Spine Health, and Pyun in furtherance of the fraudulent scheme involve participating in the referral of Insureds to Gerling Institute for medically unnecessary services and performing unnecessary services on behalf of Gerling Institute.

313.    The conduct of NY Orthopedics, Spine Health, and Pyun was significant and material. The conduct of NY Orthopedics, Spine Health, and Pyun was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Gerling Institute and Gerling to obtain payment from GEICO and from other insurers.

314.    NY Orthopedics, Spine Health, and Pyun aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Gerling Institute for non-reimbursable and medically unnecessary Fraudulent Services, because it sought to continue profiting through the fraudulent scheme.

315.    The conduct of NY Orthopedics, Spine Health, and Pyun caused GEICO to pay more than $1,000,000.00 pursuant to the fraudulent bills submitted or caused to be submitted through Gerling Institute.

316.    NY Orthopedics, Spine Health, and Pyun's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

317.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**ELEVENTH CAUSE OF ACTION**
**Against Gerling Institute and Gerling**
**(Unjust Enrichment)**

318.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 249 above.

319.    As set forth above, Gerling Institute and Gerling have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

320.    When GEICO paid the bills and charges submitted or caused to be submitted by Gerling Institute and Gerling through Gerling Institute for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

321.    Gerling Institute and Gerling have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

322.    Gerling Institute and Gerling's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

323.    By reason of the above, Gerling Institute and Gerling have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,000,000.00.

**TWELFTH CAUSE OF ACTION**
**Against Gerling**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

324.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 249 above.

325.    Spine Health is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

326.    Gerling knowingly conducted and/or participated, directly or indirectly, in the conduct of Spine Health's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over four years seeking payments that Spine Health was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the Defendants were engaged in an unlawful referral and self-referral scheme; (iv) the billed-for services, in many cases, were not legitimately performed at all; (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (vi) neither Spine Health nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

327.    Spine Health's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Gerling has operated Spine Health, inasmuch as Spine Health is not engaged in a legitimate chiropractic practice, and acts of mail fraud therefore are essential in order for Spine Health to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Gerling continues to submit fraudulent billing to GEICO, and continues to attempt collection on the fraudulent billing submitted through Spine Health to the present day.

328.     Spine Health is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Spine Health in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

329.     GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $150,000.00 pursuant to the fraudulent bills submitted through Spine Health.

330.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

<div align="center">

**THIRTEENTH CAUSE OF ACTION**
**Against Pyun and Gerling**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

</div>

331.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 249 above.

332.     Spine Health is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

333.     Pyun and Gerling are employed by and/or associated with the Spine Health enterprise.

334.     Pyun and Gerling knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Spine Health enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than four years seeking

payments that Spine Health was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the Defendants were engaged in an unlawful referral and self-referral scheme; (iv) the billed-for services, in many cases, were not legitimately performed at all; (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (vi) neither Spine Health nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

335.   Pyun and Gerling knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

336.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $150,000.00 pursuant to the fraudulent bills submitted through Spine Health.

337.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

<div style="text-align:center">

**FOURTEENTH CAUSE OF ACTION**
**Against Spine Health and Gerling**
**(Common Law Fraud)**

</div>

338.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 249 above.

339.   Spine Health and Gerling intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

340.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "3" the representation that Spine Health and Gerling were in compliance with all significant laws and regulations governing health care practice, when in fact they were not; (ii) in every claim identified in Exhibit "1", the representation that Spine Health and Gerling were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "3", concealment of the Defendants' illegal kickback and referral scheme; (iv) in every claim identified in Exhibit "3", the representation that the Fraudulent Services were medically necessary, and in some cases actually performed, when in fact the Fraudulent Services were not medically necessary, in some cases were not performed at all, and were performed – to the extent that they were performed at all – as part of a pre-determined fraudulent treatment and billing protocol designed to financially enrich Spine Health and Gerling, not to benefit the Insureds who supposedly were subjected to them; and (v) in every claim identified in Exhibit "3", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing health care practice, and were eligible for PIP reimbursement, when in fact they were not.

341.   Spine Health and Gerling intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Spine Health that were not compensable.

342.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $150,000.00 pursuant to the fraudulent bills submitted by the Defendants through Spine Health.

343.    Spine Health and Gerling's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages

344.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTEENTH CAUSE OF ACTION**
**Against Pyun**
**(Aiding and Abetting Fraud)**

345.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 249 above.

346.    Pyun knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Spine Health and Gerling.

347.    The acts of Pyun in furtherance of the fraudulent scheme involve participating in the referral of Insureds to Spine Health for medically unnecessary services and performing unnecessary services on behalf of Spine Health.

348.    The conduct of Pyun was significant and material. The conduct of Pyun was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Spine Health and Gerling to obtain payment from GEICO and from other insurers.

349.    Pyun aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Spine Health for non-reimbursable and medically unnecessary Fraudulent Services, because it sought to continue profiting through the fraudulent scheme.

350.    The conduct of Pyun caused GEICO to pay more than $150,000.00 pursuant to the fraudulent bills submitted or caused to be submitted through Spine Health.

351.    Pyun's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

352.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SIXTEENTH CAUSE OF ACTION
### Against Spine Health and Gerling
### (Unjust Enrichment)

353.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 249 above.

354.    As set forth above, Spine Health and Gerling have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

355.    When GEICO paid the bills and charges submitted or caused to be submitted by Spine Health and Gerling through Spine Health for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

356.    Spine Health and Gerling have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

357.    Spine Health and Gerling's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

358.    By reason of the above, Health Consult and Gerling have been unjustly enriched in an amount to be determined at trial, but in no event less than $650,000.00.

## SEVENTEENTH CAUSE OF ACTION
### Against Gerling
### (Violation of RICO, 18 U.S.C. § 1962(c))

359.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 249 above.

360.    Spine Consult is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

361.    Gerling knowingly conducted and/or participated, directly or indirectly, in the conduct of Spine Consult's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over four years seeking payments that Spine Consult was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the Defendants were engaged in an unlawful referral and self-referral scheme; (iv) the billed-for services, in many cases, were not legitimately performed at all; (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (vi) neither Spine Consult nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to

GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

362.     Spine Consult's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Gerling has operated Spine Consult, inasmuch as Spine Consult is not engaged in a legitimate chiropractic practice, and acts of mail fraud therefore are essential in order for Spine Consult to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Gerling continues to submit fraudulent billing to GEICO, and continues to attempt collection on the fraudulent billing submitted through Spine Consult to the present day.

363.     Spine Consult is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Spine Consult in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

364.     GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $650,000.00 pursuant to the fraudulent bills submitted through Spine Consult.

365.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### EIGHTEENTH CAUSE OF ACTION
### Against Gerling, NY Orthopedics, Spine Health, and Pyun
### (Violation of RICO, 18 U.S.C. § 1962(d))

366.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 249 above.

367.    Spine Consult is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

368.    Gerling, NY Orthopedics, Spine Health, and Pyun are employed by and/or associated with the Spine Consult enterprise.

369.    Gerling, NY Orthopedics, Spine Health, and Pyun knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Spine Consult enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than four years seeking payments that Spine Consult was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the Defendants were engaged in an unlawful referral and self-referral scheme; (iv) the billed-for services, in many cases, were not legitimately performed at all; (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (vi) neither Spine Consult nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4". Each such mailing was made in furtherance of the mail fraud scheme.

370.    Gerling, NY Orthopedics, Spine Health, and Pyun knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

371.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $650,000.00 pursuant to the fraudulent bills submitted through Spine Consult.

372.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

<div align="center">

**NINETEENTH CAUSE OF ACTION**
**Against Spine Consult and Gerling**
**(Common Law Fraud)**

</div>

373.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 249 above.

374.    Spine Consult and Gerling intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

375.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "4" the representation that Spine Consult and Gerling were in compliance with all significant laws and regulations governing health care practice, when in fact they were not; (ii) in every claim identified in Exhibit "1", the representation that Spine Consult and Gerling were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "4", concealment of the Defendants' illegal kickback and referral scheme; (iv) in every claim identified in Exhibit "4", the representation that

the Fraudulent Services were medically necessary, and in some cases actually performed, when in fact the Fraudulent Services were not medically necessary, in some cases were not performed at all, and were performed – to the extent that they were performed at all – as part of a pre-determined fraudulent treatment and billing protocol designed to financially enrich Spine Consult and Gerling, not to benefit the Insureds who supposedly were subjected to them; and (v) in every claim identified in Exhibit "4", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing health care practice, and were eligible for PIP reimbursement, when in fact they were not.

376.   Spine Consult and Gerling intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Spine Consult that were not compensable.

377.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $650,000.00 pursuant to the fraudulent bills submitted by the Defendants through Spine Consult.

378.   Spine Consult and Gerling's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages

379.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTIETH CAUSE OF ACTION
### Against NY Orthopedics, Spine Health, and Pyun
### (Aiding and Abetting Fraud)

380. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 249 above.

381. NY Orthopedics, Spine Health, and Pyun knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Spine Consult and Gerling.

382. The acts of NY Orthopedics, Spine Health, and Pyun in furtherance of the fraudulent scheme involve participating in the referral of Insureds to Spine Consult for medically unnecessary services and performing unnecessary services on behalf of Spine Consult.

383. The conduct of NY Orthopedics, Spine Health, and Pyun was significant and material. The conduct of NY Orthopedics, Spine Health, and Pyun was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Spine Consult and Gerling to obtain payment from GEICO and from other insurers.

384. NY Orthopedics, Spine Health, and Pyun aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Spine Consult for non-reimbursable and medically unnecessary Fraudulent Services, because it sought to continue profiting through the fraudulent scheme.

385. The conduct of NY Orthopedics, Spine Health, and Pyun caused GEICO to pay more than $650,000.00 pursuant to the fraudulent bills submitted or caused to be submitted through Spine Consult.

386. NY Orthopedics, Spine Health, and Pyun's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

387. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-FIRST CAUSE OF ACTION
### Against Spine Consult and Gerling
### (Unjust Enrichment)

388. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 249 above.

389. As set forth above, Spine Consult and Gerling have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

390. When GEICO paid the bills and charges submitted or caused to be submitted by Spine Consult and Gerling through Spine Consult for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

391. Spine Consult and Gerling have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

392. Spine Consult and Gerling's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

393. By reason of the above, Spine Consult and Gerling have been unjustly enriched in an amount to be determined at trial, but in no event less than $650,000.00.

## TWENTY-SECOND CAUSE OF ACTION
### Against Gerling and NY Orthopedics
### (Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A.17:33A-1 et seq.)

394.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 249 above.

395.    In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "1", Gerling and NY Orthopedics knowingly submitted or caused to be submitted hundreds of HCFA-1500 forms and treatment reports to GEICO containing thousands of individual charges that were false and misleading in the following material respects:

(i)    The HCFA-1500 forms and treatment reports submitted by and on behalf of Gerling and NY Orthopedics uniformly misrepresented to GEICO that Defendants were in compliance with all applicable statutory and regulatory requirements governing health care practice in New Jersey, and therefore were eligible to receive PIP reimbursement. In fact, Gerling and NY Orthopedics were not in compliance with all applicable statutory and regulatory requirements governing health care practice in New Jersey, and therefore were not eligible to receive PIP reimbursement because: (a) Gerling and NY Orthopedics were engaged in an illegal patient brokering, referral, and self-referral scheme; (b) Gerling and NY Orthopedics purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; (c) NY Orthopedics unlawfully operated in New Jersey as a foreign professional corporation; and (d) Gerling and NY Orthopedics routinely violated N.J.S.A. § 39:6A-4.6(c) by inflating and unbundling their charges for the Fraudulent Services.

(ii)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Gerling and NY Orthopedics uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing health care practice in New Jersey, and therefore were eligible for PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing health care practice in New Jersey, and therefore were not eligible for PIP reimbursement, because: (a) Gerling and NY Orthopedics were engaged in an illegal patient brokering, referral, and self-referral scheme; (b) Gerling and NY Orthopedics purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; (c) NY Orthopedics unlawfully operated in New Jersey as a foreign professional corporation; and (d) Gerling and NY Orthopedics routinely violated N.J.S.A. § 39:6A-4.6(c) by inflating and unbundling

their charges for the Fraudulent Services.

(iii)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Gerling and NY Orthopedics uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, to the extent that the Fraudulent Services were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment, referral, and billing protocol designed solely to financially enrich Gerling and NY Orthopedics, not to benefit the Insureds who supposedly were subjected to them.

(iv)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

396.    Gerling and NY Orthopedics' systematic violation of the New Jersey Insurance Fraud Prevention Act constituted a "pattern" of violations under the Act.  See N.J.S.A. 17:33-A-7. As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP Benefits paid in an amount to be established at trial, exceeding $400,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

### TWENTY-THIRD CAUSE OF ACTION
**Against Gerling and Gerling Institute**
**(Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A.17:33A-1 et seq.)**

397.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 249 above.

398.    In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "2", Gerling and Gerling Institute knowingly submitted or caused to be submitted hundreds of HCFA-1500 forms and treatment reports to GEICO containing thousands of individual charges that were false and misleading in the following material respects:

(i)     The HCFA-1500 forms and treatment reports submitted by and on behalf of Gerling and Gerling Institute uniformly misrepresented to GEICO that Defendants were in compliance with all applicable statutory and regulatory requirements governing health care practice in New Jersey, and therefore were eligible to receive PIP reimbursement. In fact, Gerling and Gerling Institute were not in compliance with all applicable statutory and regulatory requirements governing health care practice in New Jersey, and therefore were not eligible to receive PIP reimbursement because: (a) Gerling and Gerling Institute were engaged in an illegal patient referral and self-referral scheme; (b) Gerling and Gerling Institute purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; (c) Gerling Institute unlawfully operated in New York as a foreign professional corporation; and (d) Gerling and Gerling Institute routinely violated N.J.S.A. § 39:6A-4.6(c) by inflating and unbundling their charges for the Fraudulent Services.

(ii)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Gerling and Gerling Institute uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing health care practice in New Jersey, and therefore were eligible for PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing health care practice in New Jersey, and therefore were not eligible for PIP reimbursement, because: (a) Gerling and Gerling Institute were engaged in an illegal patient brokering, referral, and self-referral scheme; (b) Gerling and Gerling Institute purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; (d) Gerling Institute unlawfully operated in New York as a foreign professional corporation; and (e) Gerling and Gerling Institute routinely violated N.J.S.A. § 39:6A-4.6(c) by inflating and unbundling their charges for the Fraudulent Services.

(iii)   The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Gerling and Gerling Institute uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, to the extent that the Fraudulent Services were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment, referral, and billing protocol designed solely to financially enrich Gerling and Gerling Institute, not to benefit the Insureds who supposedly were subjected to them.

(iv)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

399.     Gerling and Gerling Institute's systematic violation of the New Jersey Insurance Fraud Prevention Act constituted a "pattern" of violations under the Act.  See N.J.S.A. 17:33-A-7. As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP Benefits paid in an amount to be established at trial, exceeding $1,000,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

<div align="center">

**TWENTY-FOURTH CAUSE OF ACTION**
**Against Gerling and Spine Health**
**(Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A.17:33A-1 et seq.)**

</div>

400.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 249 above.

401.     In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "3", Gerling and Spine Health knowingly submitted or caused to be submitted hundreds of HCFA-1500 forms and treatment reports to GEICO containing thousands of individual charges that were false and misleading in the following material respects:

(i)      The HCFA-1500 forms and treatment reports submitted by and on behalf of Gerling and Spine Health uniformly misrepresented to GEICO that Defendants were in compliance with all applicable statutory and regulatory requirements governing health care practice in New Jersey, and therefore were eligible to receive PIP reimbursement. In fact, Gerling and Spine Health were not in compliance with all applicable statutory and regulatory requirements governing health care practice in New Jersey, and therefore were not eligible to receive PIP reimbursement because: (a) Gerling and Spine Health were engaged in an illegal patient referral and self-referral scheme; (b) Gerling and Spine Health purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; and (c) Gerling and Spine Health routinely violated N.J.S.A. § 39:6A-4.6(c) by inflating and unbundling their charges for the Fraudulent Services.

(ii)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted

by Gerling and Spine Health uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing health care practice in New Jersey, and therefore were eligible for PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing health care practice in New Jersey, and therefore were not eligible for PIP reimbursement, because: (a) Gerling and Spine Health were engaged in an illegal patient referral and self-referral scheme; (b) Gerling and Spine Health purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; and (c) Gerling and Spine Health routinely violated N.J.S.A. § 39:6A-4.6(c) by inflating and unbundling their charges for the Fraudulent Services.

(iii)   The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Gerling and Spine Health uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, to the extent that the Fraudulent Services were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment, referral, and billing protocol designed solely to financially enrich Gerling and Spine Health, not to benefit the Insureds who supposedly were subjected to them.

(iv)   The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

402.   Gerling and Spine Health's systematic violation of the New Jersey Insurance Fraud Prevention Act constituted a "pattern" of violations under the Act.  See N.J.S.A. 17:33-A-7. As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP Benefits paid in an amount to be established at trial, exceeding $150,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

## TWENTY-FIFTH CAUSE OF ACTION
### Against Gerling and Spine Consult
### (Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A.17:33A-1 et seq.)

403.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 249 above.

404.    In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "4", Gerling and Spine Consult knowingly submitted or caused to be submitted hundreds of HCFA-1500 forms and treatment reports to GEICO containing thousands of individual charges that were false and misleading in the following material respects:

(i)    The HCFA-1500 forms and treatment reports submitted by and on behalf of Gerling and Spine Consult uniformly misrepresented to GEICO that Defendants were in compliance with all applicable statutory and regulatory requirements governing health care practice in New Jersey, and therefore were eligible to receive PIP reimbursement. In fact, Gerling and Spine Consult were not in compliance with all applicable statutory and regulatory requirements governing health care practice in New Jersey, and therefore were not eligible to receive PIP reimbursement because: (a) Gerling and Spine Consult were engaged in an illegal patient referral and self-referral scheme; (b) Gerling and Spine Consult purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; and (c) Gerling and Spine Consult routinely violated N.J.S.A. § 39:6A-4.6(c) by inflating and unbundling their charges for the Fraudulent Services.

(ii)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Gerling and Spine Consult uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing health care practice in New Jersey, and therefore were eligible for PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing health care practice in New Jersey, and therefore were not eligible for PIP reimbursement, because: (a) Gerling and Spine Consult were engaged in an illegal patient referral and self-referral scheme; (b) Gerling and Spine Consult purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; and (c) Gerling and Spine Consult routinely violated N.J.S.A. § 39:6A-4.6(c) by inflating and unbundling their charges for the Fraudulent Services.

(iii)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted

by Gerling and Spine Consult uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, to the extent that the Fraudulent Services were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment, referral, and billing protocol designed solely to financially enrich Gerling and Spine Consult, not to benefit the Insureds who supposedly were subjected to them.

(iv)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

405.     Gerling and Spine Consult's systematic violation of the New Jersey Insurance Fraud Prevention Act constituted a "pattern" of violations under the Act.  See N.J.S.A. 17:33-A-7. As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP Benefits paid in an amount to be established at trial, exceeding $650,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement

**JURY DEMAND**

406.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.     On the First Cause of Action against NY Orthopedics, Gerling Institute, Spine Health, and Spine Consult, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that NY Orthopedics, Gerling Institute, Spine Health, and Spine Consult have no right to receive payment for any pending bills submitted to GEICO;

B.      On the Second Cause of Action against Gerling, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $400,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Gerling, Pyun, Dovman, Gran, and Campiro, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $400,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against NY Orthopedics and Gerling, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $400,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against Pyun, Dovman, Gran, and Campiro, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $400,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against NY Orthopedics and Gerling, more than $400,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against Gerling, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,000,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.      On the Eighth Cause of Action Gerling, NY Orthopedics, Spine Health, and Pyun, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of

$1,000,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.      On the Ninth Cause of Action against Gerling Institute and Gerling, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,000,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against NY Orthopedics, Spine Health, and Pyun, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,000,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

K.      On the Eleventh Cause of Action against Gerling Institute and Gerling, more than $1,000,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

L.      On the Twelfth Cause of Action against Gerling, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $150,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

M.      On the Thirteenth Cause of Action against Pyun and Gerling, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $150,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

N.      On the Fourteenth Cause of Action against Spine Health and Gerling, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $150,000.00,

together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

  O. On the Fifteenth Cause of Action against Pyun, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $150,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

  P. On the Sixteenth Cause of Action against Gerling and Spine Health, more than $650,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

  Q. On the Seventeenth Cause of Action against Gerling, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $650,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

  R. On the Eighteenth Cause of Action against Gerling, NY Orthopedics, Spine Health, and Pyun, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $650,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

  S. On the Nineteenth Cause of Action against Spine Consult and Gerling, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $650,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

  T. On the Twentieth Cause of Action against NY Orthopedics, Spine Health, and Pyun, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $650,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

U.      On the Twenty-First Cause of Action against Spine Consult and Gerling, more than $650,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

V.      On the Twenty-Second Cause of Action against Gerling and NY Orthopedics, damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $400,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

W.      On the Twenty-Third Cause of Action against Gerling and Gerling Institute, damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $1,000,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

X.      On the Twenty-Fourth Cause of Action against Gerling and Spine Health, damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $150,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7; and

Y.      On the Twenty-Fifth Cause of Action against Gerling and Spine Consult, damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $650,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in

connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and

counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7.

Dated: October 16, 2023

<div style="margin-left:3em">

RIVKIN RADLER LLP

By:    <u>/s/ *Max Gershenoff*</u>
Barry I. Levy, Esq. (BL 2190)
Max Gershenoff, Esq. (MG 4648)
Steven T. Henesy, Esq. (SH 6357)
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company*

</div>